In re CURTICE'S ESTATE.

(Supreme Court, Appellate Division, Fourth Department. January 3, 1906.)

TAXATION—ESTATE OF DECEDENT—VALUE OF STOCK—EVIDENCE.

> Laws 1891, p. 50, c. 34, providing that, when it is necessary to appraise the estate of a decedent, the appraisers shall value such stocks as are customarily bought or sold in the open markets by ascertaining the range of the market, and the average of prices as thus found, running through a reasonable period of time, is not applicable in case of a private family corporation, having 15,000 shares of stock, not dealt in on any other than the local market, where there have been but a few sales of small lots none of over 20 shares, with the exception of one of 50 shares, and decedent has left nearly 6,000 shares.

> Spring and Williams, JJ., dissenting.

Appeal from Order of Surrogate, Monroe County.

In the matter of the appraisal of the estate of Simeon G. Curtice, deceased, under the acts relative to the taxable transfers of property. From so much of the order of the surrogate as fixed the cash value of the property transferred to Grace C. Curtice at $804,267.45, and as assessed the amount of tax thereon at $8,042.67, and fixed the entire amount of decedent's estate and of the tax thereon in accordance with such amounts, Edgar N. Curtice and others, executors, and Grace C. Curtice, legatee, appeal; the Comptroller of the state being respondent. Modified.

Argued before McLENNAN, P. J., and SPRING, WILLIAMS, HISCOCK, and NASH, JJ.

M. H. McMath and Walter S. Hubbell, for appellants.
William T. Plumb, for respondent.

HISCOCK, J. The appellants' sole complaint is that the surrogate has approved and fixed too high a valuation and too large a tax upon certain capital stock belonging to the estate of the decedent, and passing under his will to his daughter.

I think that the complaint is well founded, and that the valuation and resulting tax should be reduced. The specific property involved is 3,737 shares of the common, and 2,025 shares of the preferred, capital stock of Curtice Bros. Company, and which has been appraised at $110 and $107.50 per share. It is claimed that said valuations should not have exceeded $80 and $90 per share, respectively. While the determination of the values of these stocks must be more or less a matter of speculation, I think that a valuation of the preferred stock at $97.50 and of the common stock at $100 per share will be nearer correct for the purposes of this proceeding than that adopted by the learned surrogate. Curtice Bros. Company was a private family corporation, engaged in manufacturing catsups, jellies, etc., and having its principal place of business in Rochester. The entire capitalization of the company consisted of 7,000 shares of preferred, and 8,000 shares of common, stock. The active manager of the company was a brother of the deceased. The company had been in existence four or five years, and had paid dividends at the rate of 10 per cent. per annum upon the common, and of 7 per cent. per annum upon the preferred. The stock, as might

be expected, was an inactive one. It does not appear to have been listed or dealt in upon any stock exchange or market other than the local one at Rochester. A few scattering sales had been reported at the latter during the year or more preceding decedent's death, and immediately after his death there was a bid quotation of $110 per share for the common, and a reported sale upon the exchange sheet of 10 shares of the preferred at $107.50, and which figures were adopted by the surrogate. Outside of one sale of 50 shares at 105½ there is no evidence of any sale of, or quotation upon, a larger lot of stock than 10 or 20 shares. Only two witnesses were sworn as to the value of the stock, and they seem to have been entirely familiar with the limitations of the market for it, and with the conditions and considerations which would fix its value. They agreed that the fair market valuations would be for the preferred 90 and for the common 80. Upon cross-examination they referred to the sales of occasional small lots at the higher prices already mentioned, and accounted for the difference between such prices and the valuations fixed by them by and upon the theory, in substance, that while small lots could be sold for the higher prices, there would not be a demand which would absorb in any reasonable time the large amount held by decedent's estate at such prices.

It is urged by the learned counsel for the respondent that this theory is hypothetical and speculative, and that it should yield to the concrete fact that some of the stock has actually been sold or bid for at the prices adopted by the surrogate. But in my judgment the fact referred to is not wholly applicable to, or controlling of, the conditions and question now presented to us.

The basic issue to be determined by the surrogate was what was the "clear market value"—the "fair market value"—of 3,737 shares of the common, and of 2,025 shares of the preferred, stock in question, for purposes of taxation, with a reasonable time and under fair opportunities for purchase. The executors would not be justified in recklessly and precipitately throwing the stock upon the market in such a manner as would inevitably invite sacrifice. Neither should they be compelled to occupy an indefinite time in the attempt to peddle the stock out in 10-share lots.

It must be apparent at once that the question thus presented under the circumstances of this case is a very different one from that of the prices obtained for a few small lots from time to time, and mostly before any possible complications were suggested by the death of decedent. The only witnesses sworn testified positively that there would not be a market for such a large amount at the higher prices, and that the valuations named by them would be a fair market price. It is true that that is an opinion merely, but it is the opinion of conceded experts, who are not contradicted, except by the record of the sales already referred to. Moreover, ordinary observation and judgment tends to confirm their opinion, at least to some extent. Here was a total holding of stock of the par value of $576,200 out of a total capitalization of $1,500,000. Yet, while it represents a very large amount, it was still a minority holding in a private corporation, controlled by the family to which decedent had belonged. The stock was closely held. There was no general and public ownership of it or market for it, and, while

an investor might be willing to take a small amount at a high price, possibly, determined by dividends, it does not follow that there could be found to absorb so large an amount either a sufficient number of small purchasers or large purchasers who would be willing to invest so large a sum, which still would not give them control, but leave them more or less at the mercy of a united family. It needs no extended argument to show that the sale of this large minority block of stock in a comparatively small concern upon a local and restricted market is entirely different from that of a sale of much larger amount of the stock of a large and public corporation in a broad and general market like the New York Stock Exchange. It must be more or less a matter of opinion, and even of conjecture, what could be obtained for it. But what I do feel very certain of is that the price obtained for a few little lots is not a fair measure of valuation for the large amount involved in these proceedings, and that the valuation suggested of par for the common and 87½ for the preferred is quite liberal, in view of all the attendant contingencies. No evidence was given as to the intrinsic value of the stock, outside of the fact that it paid certain dividends. We may, however, take judicial notice of the fact that the value of industrial stocks often does not bear close apparent relations to the rate of dividends which they may happen to pay at a given time, and the latter is not by any means a controlling gauge of values. In re Smith, 71 App. Div. 605, 76 N. Y. Supp. 185.

Counsel for respondent especially calls our attention to a statute and to a decision of the Court of Appeals as justifying the action of the surrogate. Chapter 34, p. 50, of the Laws of 1891, provides that:

"Whenever * * * it shall become necessary to appraise in whole or in part the estate of any deceased person * * * the persons whose duty it shall be to make such appraisal shall value * * * all such property, stocks * * * as are customarily bought or sold in the open markets in the city of New York, or elsewhere, for the day on which such appraisal or report may be required by ascertaining the range of the market and the average of prices as thus found running through a reasonable period of time."

Assuming that this statute might be applicable to such an appraisal as this, I think it quite apparent that it is not controlling here. The evidence does not disclose any such free or customary market dealings in the stock in question as fairly to bring it within the scope of this statute. The same surrogate who decided this proceeding held that. said statute was not applicable to the appraisal in a similar case of an inactive stock of which there were infrequent sales. In re Judson, affirmed 73 App. Div. 620, 76 N. Y. Supp. 1017. The decision referred to is that found in Dana v. Fiedler, 12 N. Y. 40, 62 Am. Dec. 130. In that case the defendant had defaulted in performance of a contract to deliver certain articles, and he attempted to reduce damages by showing that, if plaintiff had attempted to sell, the market price, as evidenced by sales proved, might have been broken. I think the case may be distinguished from this. In the first place, the courts would be less liberal in laying down the rule of damages against a defaulting vendor than in fixing the fair market value of an estate for the purpose of taxing an heir who had been guilty of no default or wrongdoing. In the second place, the rule is and was well established that

plaintiff for his measure of damages was entitled to the difference between his contract price and the price at which he could purchase in the open market. Therefore, the immediate question was not of selling, but of buying. And, in the third place, the opinion does not indicate any such cogent evidence, as in this case, of the probabilities which would attend the attempt to sell a large amount of property.

I do not think there is anything in the case which compels us to attempt to look over or around the results to alleged market prices, which in my judgment obviously would follow the effort to sell the stock in question.

The order appealed from should be modified by deducting from the total valuation of decedent's estate, as also from the amount transferred to Grace C. Curtice, the sum of $57,620, which is the difference between the amounts at which the capital stock in Curtice Bros. Company was appraised and par, and $97.50 per share for the common and preferred stocks, respectively, and by deducting 1 per cent., or $576.20, from the total tax, as well as from the tax upon the share of said Grace C. Curtice; and, as so modified, said order should be affirmed, without costs to either party. All concur, except SPRING and WILLIAMS, JJ., who dissent.