In the Matter of the Transfer Tax upon the Estate of FRANK J. DUPIGNAC, Deceased.

Surrogate's Court, Westchester County, April 7, 1924.

Taxation — transfer tax — terms " clear," " fair " and " cash " value as used in Tax Law are synonymous — proceeding to fix value of property transferred by will — method of determining clear market value of closely held stock, patents and good will of corporation.

The terms " clear market value," " fair market value " and " cash value " as used in the Tax Law, section 220, subdivision 8, and sections 230 and 231 must be assumed to be equivalent and so synonymous terms.

The method adopted by the courts in arriving at the fair or clear market value of closely held stock is to value the corporate assets in the manner that a buyer would value them, to ascertain the cash value of the property which the shares represent, assigning to each share its proportionate worth. The book value of stock is its intrinsic value. If there have been no sales, the assessor must necessarily fall back upon the book value as the nearest approximation to the fair market value. In the absence of sales, the book value must be taken as the basis of computation.

There seems to be no principle governing the valuation of patent rights and in the instant case no attempt has been made to place a value thereon other than the amount carried upon the company's books.

Although the courts have not adopted any inflexible rule for ascertaining the value of good will they have decided that the value may be fairly arrived at by multiplying the average net profits for a number of years by a number of years purchase, such number being suitable and proper, having regard to the nature and character of the business as a question of fact depending upon the facts in each case.

TRANSFER tax proceeding.

*Charles A. Curtin* (*A. Welles Stump* and *Irving N. Tompkins*, of counsel), for the State Tax Commission.

*Deane & Cook* (*Joseph G. Deane* and *William J. Wallin*, of counsel), for the executors.

SLATER, S. The testator died May 10, 1922, leaving a will which was probated June 8, 1923, and upon which letters testamentary were duly issued to the executors named therein. A proceeding was commenced in the Surrogate's Court to fix the clear

market, or the fair market, or the cash value of the estate for the purpose of determining the amount of the transfer tax imposed upon the transfers made by the will. Tax Law, art. X, § 220, subd. 8; Id. §§ 230, 231. The report of the transfer tax appraiser was filed February 9, 1923, during the incumbency of the temporary administrator. The *pro forma* order was made by the surrogate on the same day. Upon appeal the *pro forma* order was affirmed May 1, 1923. A notice of motion was made for a rehearing. The motion was granted by order dated June 29, 1923, and this court has undertaken, as an assessing officer, to take proof of the clear market value of the property transferred by said will. Transfer Tax Law, § 230; *Matter of Barnes*, 83 Misc. Rep. 272.

Among the securities owned by the decedent at the time of his death were certain shares of the stock of the DeLaval Separator Company, a New Jersey corporation having its manufacturing plant at Poughkeepsie, N. Y. The company manufactures patent cream separators, milking machines, oil separators and other patented mechanical appliances, and also agricultural implements. The corporation employs 1,400 employees. The contention has to do with the value of the stock of said company, of which the decedent owned 950 shares of the par value of $100 per share and 200 shares of the par value of $25 per share. The stock issued at $100 per share had been assessed by the transfer tax appraiser at $598.50 per share, and the stock issued at $25 per share had been assessed at $149.71½ per share. The evidence before the appraiser is before the court with additional proofs offered at the hearing.

The balance sheets of said corporation for the years 1913 to 1921, inclusive, were offered in evidence, as well as sheets showing yearly net profits and annual dividends. *Matter of Crawford*, 85 Misc. Rep. 283. They set forth certain items of assets and certain items of liabilities. It was stipulated by counsel that the item of "manufacturing plant, real estate, machinery and equipment" which had been carried at $1,928,012.09 on the balance sheet of 1921 should be fixed for the purpose of this transfer tax proceeding at $2,175,000. The auditor of the company testified that the lawful yearly depreciation to the plant had been made. He also testified that the annual profits of certain subsidiary companies belonging to the parent corporation had not been shown on the balance sheet of the parent company. This was later supplied. The excess book value of the subsidiary companies not taken up on the books of the DeLaval Separator Company, and not shown on the balance sheets, is as follows: December 31, 1917, $94,277.19; December 31, 1918, $178,224.63; December 31, 1919, $296,393.93; December 31, 1920, $497,564.89; December 31, 1921, $271,283.84.

The questions at issue relate to the method to be employed in reaching the clear market value of stock, and the value of the patents and good will of said corporation. The patents have been carried on the books for a number of years last past at $100,000. Since 1916 the good will had been carried at $3,633,055.62.

Section 220, subdivision 8, of the Tax Law relating to taxable transfers states that the tax imposed shall be upon the " clear market value " of the property. Section 230 of the Tax Law speaks of the " fair market value " of property of persons whose estates shall be subject to the payment of any tax imposed by this article. Section 231 of the Tax Law says: " The surrogate shall forthwith, as of course, determine the *cash value* of all estates * * *." The phrases " clear market value," " fair market value " and " cash value " must be assumed to be equivalent and so synonymous terms. Jessup-Redfield Surr. 1094, 1095. The expression " cash value " as used in a direction to assessing officers means actual value. *Cummings* v. *National Bank*, 101 U. S. 153, 162. The words " market value " mean the price which the thing will command in the market. *Matter of McGhee* v. *State*, 105 Iowa, 9. " Fair market value " has never been construed to mean the selling price of property at a forced, or involuntary, sale. *Walker* v. *People*, 192 Ill. 106.

The tax upon the right to succeed to property is fixed upon the *fair* market, or *clear* market, or *cash* value of the interest. The words " clear " and " fair " market value as used in the Tax Law mean the open, or honest, market. To fix the " value " of a thing means to assess, appraise, to estimate, or rate the value of, worth estimated in money, in a restricted sense, market value. The word " market " value means state of trade as determined by prices pursuant to the law of supply and demand. Ordinarily, the value of a thing is determined by the price it will bring in an honest and open market. A money legacy is appraised at its value in dollars and so a legacy of other personal property must be appraised at its worth in dollars, unless another method is provided by law. A share of stock represents the interest which the shareholder has in the corporate and net earnings of the corporation. *Jermain* v. *Lake Shore & M. S. Ry. Co.*, 91 N. Y. 483, 491. It is a right in the ultimate assets of the corporation.

The stock of the instant corporation is known as a closely held stock, no sales having been reported for over ten years last past. It is contended by the executors that the rule of law laid down by the courts in arriving at the clear market value of closely held securities is unequitable, unfair and unconstitutional. The executors offered to prove by a statistical expert what would be

Surrogate's Court, Westchester County, April, 1924.        [Vol. 123

the fair market value of said stock by comparison with stock of corporations which he claimed to have a fixed relation to market value, as demonstrated by an analysis and comparison which he made with stocks of certain corporations, the stock of which is generally and actively dealt in on the market. The estate says the rule invoked by the state tax commission that all closely held stocks must be worth at least the book value of assets is unsound in fact and in economics; that book value is one of the elements entering into the determination of the appraisal; but it is only one of several elements and the least important of all; that current earnings and prospect of future earnings are far more controlling elements in market price than the record of past earnings; that the nature of the industry is also an element to be considered. The affidavit of the president of the corporation fixing a value of $350 per share is also submitted.

This method, contended for by the executors, in my opinion, is unsound, untenable and cannot be accepted as the correct rule in determining the value of the stock for the purpose of this proceeding. While it is true that the stock of many industrial corporations, actively dealt in upon the exchange, or on the curb, sell at prices below book value, it is also true that stocks so dealt in sell at prices above book value. *People* v. *Coleman,* 107 N. Y. 541, 544. If the method contended for by the executors is adopted, what kind of stocks will serve as a guide in determining the valuation of this, or any closely held stock? Which particular stock is to be selected from any group for the comparison? Is an average to be taken of all the stocks presented as selling below book value, or shall the average be of the stocks selling above book value? It follows that the argument is specious. Such character of proof of fair market value is not convincing. The result must be uncertain and indefinite. Such comparison is not a proper test to guide. The stocks carrying a market value above book value could well be used for comparison. The result in either event would be predicated upon a foundation of uncertainty. It would not be proof of the fair market value of the stock under appraisal. *Matter of Laidlaw,* 176 N. Y. Supp. 885; *Matter of Locke,* N. Y. L. J. July 25, 1923; *Matter of Marshall,* Id. April 1, 1924. There is no presumption in respect of the value of the shares of capital stock. *Hussey* v. *Flanagan,* 237 N. Y. 227, 235.

The question of fact must be determined upon evidence. A list of stocks selling below book value is valueless as evidence to prove that the clear market value of the stock of the company in the instant case should be assessed below book value. Only probative evidence is considered. *Matter of Case,* 214 N. Y. 199. The stocks

of many manufacturing companies, particularly where the stock is closely held, sell in many instances above book value. The stocks of companies on the lists submitted by the expert for the estate as selling below book value may be preceded by, and subject to, prior bond issues, mortgages or preferred stock. It would be dangerous and wholly unreliable to attempt to compare the value of stock of a company founded upon substantial assets, as in the instant case, with the market value of stock of other companies, without evidence as to the assets and liabilities of such other corporations.

Recently Mr. Justice Brandeis had occasion to review the subject of the weight to be accorded an expert's report in the case of *Missouri ex rel. S. W. Bell Tel. Co.* v. *Pub. Service Comm.*, 262 U. S. 276, 299. He said, in referring to testimony of an engineer: " But gradually it came to be realized that the definiteness of the engineer's calculations was delusive; that they rested upon shifting theories; and that their estimates varied so widely as to intensify, rather than to allay doubts." These words may well be applied to the report of the statistical expert in the instant case. Such a report used as a basis for comparison rises, at best, only to the plane of a dignified guess. Expert testimony manifestly unreasonable on its face need not be accepted. *Matter of Gilbert*, 176 App. Div. 850, 854.

The Decedent Estate Law, section 122, states that in an appraisal of the estate of a deceased person the *real estate* shall be valued at its full and true value, taking into consideration actual sales of neighboring real estate similarly situated during the year immediately preceding the date of such appraisal, if any (*Matter of Paterno*, 182 App. Div. 478), and that the value of all such property, *stocks, bonds or securities as are customarily bought or sold in open markets* in the city of New York, or elsewhere, may be ascertained by the range of the market and the average of prices running through a reasonable period of time.

This section does not apply to the appraisal of stock where the evidence does not disclose any free or customary market dealing in the stock. *Matter of Curtice*, 111 App. Div. 230; affd., 185 N. Y. 543; *Matter of Judson*, 73 App. Div. 620; *Matter of Proctor*, 41 Misc. Rep. 79.

The statute law has laid down a rule governing the appraisal of stocks or other securities customarily sold in the open market. Judicial decisions have established the rule of law binding upon this court for the appraisal of stocks that are closely held and have not reached the market. In the statute there was no definition of " clear " or " fair " or " cash " value. The bare words were used.

The assessors are free to fix from probative evidence adduced the value of closely held stock. The basis is held to be the ordinary worth of the assets as valued according to good judgment. The regulations for unlisted securities, stock of close corporations, under the federal estate tax, provide that the return should be made upon the basis of the value of the stock as evidenced by the clear value of the excess of the assets of the corporation over its liabilities and its earning capacity for the five years preceding the death of the decedent.

In *People* v. *Coleman*, 107 N. Y. 541, Judge Earl, writing for the court with reference to the law which provided for the assessment of capital stock at its *actual value*, said: " The law does not prescribe how the actual value of the capital stock of a corporation is to be ascertained. That is left to the judgment of the assessors, and in appraising the actual value they have a right to resort to all the tests and measures of value which men ordinarily adopt for business purposes in estimating and measuring values of property * * *. One mode of arriving at the actual value of the capital stock a corporation is to take what is sometimes called the book value, which is reached by estimating all the assets as they appear upon the corporate books, and deducting all the liabilities and other matters required to be deducted by law, and taking the balance as the measures of value. * * * In the case of a corporation the value of whose capital stock is largely made up of its franchise, good will and business advantages, the book value of its capital stock will be less than the actual value * *. *. So the market value of the shares of capital stock may sometimes be above and sometimes below the actual value * * *. But there is no law which compels assessors to resort to market value to find the actual value of capital stock."

The legislature changed the rule of law referred to in the last paragraph when it enacted section 122 of the Decedent Estate Law, which was taken from chapter 34 of the Laws of 1891; laying down the rule of appraisal of real estate and of stocks customarily bought or sold in the open market. But as to closely held stock the way to ascertain the clear market value and the cash value is still left to the assessors, and the courts have given approval to the method to be used by assessors in such cases.

The law arbitrarily directs the manner of assessment of stocks sold on the market. That value, whatever it may be, is the worth attached by the rule of the statute law. Market value may or may not represent the actual value of corporate property. Very often it does not, and the market value of the shares of corporate stock may be quite disproportionally influenced by conditions,

or by circumstances having little reference to actual conditions. To apply the method contended for by the estate to closely held stock would be sophistical, and would accord fallacious results.

The appraisal of closely held stock in a corporation with a large capitalization is no different from the assessment of a business with large assets owned by an individual. In order to assess the assets of such an individual business, you would hardly suggest the comparison of the inventory with any other thing to ascertain its value. It would be quite impossible. Neither may closely held stock be compared with dissimilar stocks, the prices of which are made in the open market by the multitude without relation to cash value. The rule to determine the value of closely held stock is the same as with copartnership property.

The method adopted by the courts in arriving at the fair or clear market value of closely held securities is sound. It is to value the corporate assets in the manner that a buyer would value them, to ascertain the cash value of the property which the shares represent, assigning to each share its proportionate worth. The book value of stock is its intrinsic value. If there have been no sales, the assessor must necessarily fall back upon the book value as the nearest approximation to the fair market value. In the absence of sales, the book value must be taken as the basis of computation. Any other rule would be illogical, and create an impotent conclusion. The use of the words " fair market," or " clear market " value when applied to closely held stock is meaningless. Because there is no market to guide, such stock must be appraised at its value in money, its intrinsic worth. It can only be compared and measured in money value according to the assets as shown by the balance sheet, less liabilities. The assets of the balance sheet is the inventory value. Authorities in abundance support this method. Chrystie Inheritance Taxation, 613; *Matter of Brandreth*, 28 Misc. Rep. 468; revd., 58 App. Div. 575; revd., and surrogate's opinion affd., 169 N. Y. 437; *Matter of Chappell*, 151 App. Div. 774; *Matter of Ball*, 161 id. 79; *Matter of Laidlaw*, 176 N. Y. Supp. 885; *Matter of Bolton*, 121 Misc. Rep. 51; *Matter of Lowell*, Id. 106; *Pett* v. *Spiegel*, 202 N. Y. Supp. 650; *Matter of Spadone*, N. Y. L. J. May 1, 1923. The method adopted in these cases has been followed in *Matter of Felton*, 176 Cal. 663. The Court of Appeals in *Matter of Jones*, 172 N. Y. 575, 586, said: " These shares [being a joint stock corporation] were not listed upon the Stock Exchange, or sold in the open market, and the only way to get at their value was to ascertain the property they represented. (*People ex rel. Union T. Co.* v. *Coleman,* 126 N. Y. 433.) " *Matter of Crawford,* 85 Misc. Rep.

283; *Matter of Valentine*, 163 App. Div. 843; Chrystie Inheritance Taxation, 617, 619.

Judge Hiscock, now chief judge, writing in *Matter of Cooley*, 186 N. Y. 220, 232, in a case dealing with apportionment of railroad property situate in two states, said: "Upon the other hand, an apportionment based upon trackage or figures drawn from the books or balance sheets of the company may doubtless be easily reached which will be substantially correct * * *."

*Matter of Rees*, 208 N. Y. 590, affirmed without opinion the order of the Appellate Division, which affirmed without opinion the order of the surrogate. The opinion of the surrogate was that "the value of stock in a corporation, the shares of which are not customarily bought and sold in the open market, is not capable of determination with mathematical certainty; it can only be ascertained with reasonable certainty." Chrystie Inheritance Taxation, 395.

Thus it has been established in all the courts in many cases that the rule laid down in *People ex rel. Knickerbocker Fire Ins. Co.* v. *Coleman*, 107 N. Y. 541, and *Matter of Jones, supra*, is a correct one. In the absence of proof of market value, except as offered by comparisons to other stocks, I shall apply the rule and value it on the basis of the corporate assets, including good will. Ross Inheritance Taxation, 305. It is the practical means that will be just to both parties.

The estate challenges the court's method as unconstitutional. The requirement of equality and uniformity in taxation applies only to taxes in the proper sense of the word levied with the object of raising revenue for general purposes. The statute imposing taxes on inheritances, legacies and successions is not within the constitutional rule of equality. The basis is the power to regulate the transmission of and succession to property of deceased persons. It is only by force of the statute that heirs may inherit. *Matter of White*, 208 N. Y. 64. The tax is not a tax laid on the property affected, but on the privilege of transmitting and succeeding to the inheritance (*Magoun* v. *Illinois Trust & Savings Bank*, 170 U. S. 283) and the assessment only need be subject to reasonable regulations. A succession tax is a payment exacted by the state in return for the service of supplying laws to pass property. *Frothingham* v. *Shaw*, 175 Mass. 59. And it is due and payable at the death of the decedent. It is not affected by an increase or decrease in the clear market value between the date of the decedent's death and its subsequent distribution. *Matter of Penfold*, 216 N. Y. 163. If property depreciates before it reaches the legatee the remedy is by express provision of law. Gleason &

Otis Inheritance Taxation (3d ed. 1922), 35, 36; Yale L. J. April, 1924, p. 671.

No proof relating to the value of the patents was offered by either side. Where patents are taken into account in an appraisal, a study of the question of the valuation of patent rights discloses no case which lays down the principle for their appraisal. Many corporations carry patents as part of the good will; others carry their patents in a separate account. Certain companies carry patents at a nominal value, while other corporations set them forth in their balance sheet at an arbitrary and high figure. I have not attempted to place a value on the patents in the instant case other than $100,000, carried as the valuation of the patents upon the company's books.

The state tax commission challenged the figures of the balance sheet of 1921 as to real estate. The parties agreed upon an added value to the real estate. The court will determine the value of the good will.

The courts in this country have not adopted any inflexible rule for ascertaining the value of good will. They have decided that the value of good will may be fairly arrived at by multiplying the average net profits for a number of years by a number of years purchase, such number being suitable and proper, having regard to the nature and character of the business as a question of fact depending upon the facts in each case. Good will is property within the provisions of the Transfer Tax Law. *Von Bremen* v. *Mac Monnies*, 200 N. Y. 41, 51; *Matter of Ball*, 161 App. Div. 79; *Matter of Keahon*, 60 Misc. Rep. 508; Rogers Good Will, 22. As between buyer and seller the good will due to effective organization is often a more important element than tangible property.

There were offered in evidence upon the rehearing balance sheets of said corporation for the years 1913 to 1921, inclusive. Also a statement of the dividends for the same years. Also the net annual income for the like years. The statements indicated large yearly net profits, as well as the payment of very large annual dividends. For a number of years the net profits almost equalled its capitalization. In 1915 and 1916 the dividends earned and paid were seventy-five per cent of the capital stock.

In the instant case the court has taken as a basis for the value of the good will of the DeLaval Separator Company the average net earnings of seven years, 1914 to 1920, inclusive. This spreads it over a sufficient period to make generalization safe. The earnings for the year 1913 were extremely profitable, and the financial statement for the year 1921 indicated a loss. The earnings of the subsidiary companies, not shown on balance sheets for the year

1921, were $271,283.84. This may remove the loss. In any event, I have disregarded the extraordinary good year, 1913, and the alleged bad year, 1921, at either end of the average of years so that the bad year at one extreme is offset by the good year at the other. *Matter of Lincoln*, 114 Misc. Rep. 45; *Matter of Wirth*, 119 id. 736. The excess book value of the subsidiary companies heretofore stated as not shown on the balance sheets should be added to each year's profits of the parent company.

In arriving at the average profits per year for the years 1914 to 1920, inclusive, I have taken the net assets as shown in reports in evidence for each year, plus profits of the subsidiary companies:

Net assets — 1914, $5,868,797.29; 1915, $6,266,944.38; 1916, $6,437,698.68; 1917, $6,716,458.12; 1918, $7,370,730.55; 1919, $8,098,252.13; 1920, $9,012,609.27; total, $49,771,490.42. The average of seven years is $7,110,212.91.

The net income for the same years is as follows:

Net income — 1914, $1,647,357.80; 1915, $1,998,147.09; 1916, $1,584,470.39; 1917, $1,145,824.95; 1918, $1,034,899.23; 1919, $1,210,129.57; 1920, $803,717.11; total, $9,424,546.14. The average for seven years is $1,346,363.73.

Dividends — 1913, $1,062,037.50; 1914, $1,000,000; 1915, $1,500,-000; 1916, $1,500,000; 1917, $1,000,000; 1918, $500,000; 1919, $600,000; 1920, none; 1921, none.

Six per cent of the average net income is $426,612.77. Deduct this sum from the average net income, being $1,346,363.73, and we have $919,750.94 as the average net profit. *Matter of Seaich*, 170 App. Div. 686; affd., 219 N. Y. 634.

In arriving at the number, or multiple to be used to multiply the average net annual profits, to ascertain the value of the good will, I have taken into consideration the yearly earnings and the earning power (*Matter of Brandreth*, 28 Misc. Rep. 468; affd., 169 N. Y. 437); the business sales; the increased assets; the corporate existence of thirty-six years; dividends paid (*Matter of Smith*, 71 App. Div. 602); tendency to lesser earnings; the sales of the manufactured article, being fifty per cent of the country's consumption; the increased competition; the fact that the welfare of the corporation does not depend upon any one person's business capacity; the reputation and standing of the name in the trade and with the public; its location and permanency. *Matter of Keahon*, 60 Misc. Rep. 508; *Matter of McMullen*, 92 id. 637; *Matter of Halle*, 103 id. 661; *Matter of Herrmann*, 110 id. 475; *Matter of Bolton, supra;* N. Y. Law Rev. July, 1923, p. 304; *Matter of Rees*, 153 App. Div. 900; affd., 208 N. Y. 590; *Matter of Roos*, 90 Misc. Rep. 521; *Matter of Flurschein*, 107 id. 470; *Matter of Moore*, 97 id. 238; *Matter*

*of Hearn's Estate,* 182 N. Y. Supp. 363; *Von Au* v. *Magenheimer,* 115 App. Div. 84; *Pett* v. *Speigel, supra.*

There is no set years of purchase to multiply the average profits. There are a number of cases that use the multiple two, or three, but the facts are wholly unlike those of the instant case.   In *Matter of Keahon,* 60 Misc. Rep. 508, the factor three was used, the business being only fifteen years old.   In *Matter of Ball,* 161 App. Div. 79, the multiple two was used, the business was only seven years old. In *Matter of Silkman,* 121 App. Div. 202, two years was allowed; the business was nineteen years old.   In *Matter of Gumbinner,* N. Y. L. J. Oct. 19, 1915, two years was used and the business was eighteen years old.   In *Matter of Ulrici,* 111 Misc. Rep. 55, the multiple was three and the business was five years old.   In *Matter of Bolton,* 121 Misc. Rep. 51, the multiple three was used.   In *Matter of Rosenberg,* 114 N. Y. Supp. 726, two years was used.   In *Matter of Halle,* 103 Misc. Rep. 661, four years was taken.

In *Von Au* v. *Magenheimer, supra,* the average annual profits were multiplied by six.   In *Matter of McMullen,* 92 Misc. Rep. 637, the annual profits were multiplied by six years.   In *Matter of Hearn's Estate, supra,* the purchase was five years.   In *Matter of Flurschein, supra,* the firm was in existence only twelve and one-half years, but the record showed that the sales had steadily increased since the establishment of the business, and Surrogate Fowler took a five years' purchase in fixing the good will.   In *Matter of Moore,* 97 Misc. Rep. 238, the value of the stock of Tiffany & Company was in controversy.   The business was fifty years old, and the court arrived at a purchase of ten years.   In the recent case of *Pett* v. *Spiegel* (Nov. 1923), 202 N. Y. Supp. 650, 658, the referee, James W. Hyde, on a business career of ten years fixed a five-year purchase in ascertaining the value of the good will.   The report was affirmed by Mr. Justice Davis at Special Term.   Thus, there is no fixed rule.   It was stated in *Von Au* v. *Magenheimer, supra,* that the number of years purchase that were to be taken was a question of fact, not of law.

In the instant case, in view of all the facts, I have taken five years' purchase as the factor as not unreasonable, nor excessive, and being suitable and proper having reference to the nature and character of the particular business under consideration.   This causes the good will to be worth $4,598,754.80.

This sum for good will, together with the stipulated addition in the value of real estate, viz., $246,987.11; the excess book value of the subsidiary companies for 1921, viz., $271,283.84; the assets of $12,092,947.86 for 1921, as disclosed by the balance sheet, other than good will, makes the total assets of the company $17,209,973.41.

Deducting therefrom its liabilities of $3,848,800.31, and we have net assets as of December 31, 1921, amounting to $13,361,173.10. The amount of the capital stock is $2,000,000, which spread over 20,000 shares causes a value of $668.05 per share.

I assess the stock of the DeLaval Separator Company, the par value of which is $100 per share, at $668.05 per share, and the stock issued at the par value of $25 per share at $162.01 per share, for the purpose of taxable transfer in May, 1921. The average net earnings of the seven years being $1,346,363.73 plus the average of the excess book value of the subsidiary companies not shown on the balance sheets, of $249,548.49, making in all $1,595,912.22, causes an average net profit of over twenty per cent on the average value of the net assets.

Submit order of appraisal.

Decreed accordingly.