[Civ. No. 8433. Second Appellate District, Division One.—November 1, 1932.]

In the Matter of the Estate of ANNIE A. PIERCE GOODHUE, Deceased. RAY L. RILEY, Controller, etc., Appellant; FIRST TRUST & SAVINGS BANK OF PASADENA, Executor, etc., Petitioner and Respondent; ELISABETH KAIME, Objector and Respondent.

David Tannenbaum, Charles M. Cassin and W. H. H. Gentry for Appellant.

Flint & MacKay and Robert B. Jackson for Respondents.

YORK, J.— The question involved in this appeal relates to the appraisement of 938 shares of the capital stock of the Pacific Manufacturing Company of the par value of $100 per share. The state inheritance tax appraiser appraised this stock at its book value of $210 per share. Respondent Kaime, one of the heirs at law of decedent, filed her objections to said appraisement, and the matter was tried upon an agreed statement of facts, with the result that the lower court fixed the value of said shares of stock at $100 per share.

The agreed statement of facts is, in part, as follows: "The decedent above named died testate on or about December 16, 1928, a resident of Los Angeles County and left property taxable under the Inheritance Tax Laws of the State of California; that included in property left by decedent is intangible property which the Inheritance Tax Appraiser has reported to be of the fair market value of $209,230.13. That of said amount said Insurance Tax Appraiser has reported 938 shares of the capital stock of Pacific Manufacturing Company belonging to decedent at the time of her death at $196,980.00, or $210.00 per share. That the method used by said Inheritance Tax Appraiser in arriving at such valuation on said shares of stock was to take into consideration the book value only of said shares, to-wit, by appraising the value of the assets of said Pacific Manufacturing Company and by dividing the aggregate value of the entire assets, including the surplus, of said company by the number of shares of stock issued, but that in reaching such valuation the said appraiser did not take into consideration any sale of shares of stock in said corporation made before or after the death of decedent.

## "II.

"Respondent (State Controller) contends that the Inheritance Tax Appraiser used the correct and lawful method of arriving at the market value of said shares of stock and that the market value thereof is the book value thereof and is $210.00 per share.

"Objector (Respondent Kaime) contends that the Inheritance Tax Appraiser did not use the correct method in arriving at the market value of the shares of said stock and contends that the market value of said stock is the value established by actual sales of shares of stock in the Pacific Manufacturing Company both before and after the date of death of decedent, and is not in excess of $100.00 per share.

"That the controversy herein shall be limited entirely to the issue as to the method of arriving at the market value of said shares of stock, and it is agreed that no other question shall be presented to the Court for decision.

## "III.

"That Pacific Manufacturing Company is a California corporation with its principal place of business in the city of San Jose, California; that at all times herein mentioned it had issued and outstanding 10,000 shares of its capital stock of the par value of $100.00 per share; that at the date of the death of decedent she owned 938 shares of the capital stock of said company; that said stock is not listed on any stock exchange, and no sales thereof have been made by or through any stock exchange.

## "IV.

"That in the year 1918 William Hayward, Manager of a branch office of the company, purchased 10 shares of the stock of the company from F. Beaver, Jr., at $95.00 per share; that in the year 1919 the Pacific Manufacturing Company, through its officers, purchased from William Druffel 1200 shares of the stock of the company at $83.00 per share; that in the year 1920 C. Regnart, an employee of the company purchased 35 shares of said stock from D. W. McSwain, another employee of the company, for $85.00 per share; that in the same year William Hayward, an employee of the company, purchased 15 shares of said stock from C. Regnart, an employee of the company, at $100.00 per

share; that in the same year J. H. Quinn purchased from C. Regnart 20 shares of said stock at $100.00 per share; that in the year 1922 M. A. Van Sichlin purchased from the company 5 of its shares at $100.00 per share, and in the same year E. Jones purchased from the company 1 share of said stock at $100.00; and in the same year William Hayward purchased from F. Beaver, Jr., 10 shares of said stock at $95.00 per share; that in the year 1924 the company purchased from Hubert Quinn, a retiring employee, 95 shares of said stock at $110.00 per share; that in the year 1926 J. J. Miller, a director of the company, purchased from Franc Morse 5 shares of said stock at $150.00 per share, and in the same year Mrs. J. H. Pierce, already a stockholder in the company, purchased from Fred H. Metcalf, 5 shares of said stock at $125.00 per share; that in the year 1927, F. A. Birge, Vice President of the Bank of Italy, purchased from Mrs. J. H. Pierce, the wife of the President of the company, 5 shares of said stock at $125.00 per share; that on December 12, 1928, S. I. Carter purchased from H. M. Pierce 5 shares of said stock at $100.00 per share; that on October 30, 1928, C. W. Koenig, an employee of the company, purchased from the company 100 shares of said stock at $100.00 per share; that on October 2, 1928, C. A. Linderoth purchased from S. I. Carter 5 shares of said stock at $115.00 per share; that on October 5, 1929, John J. Miller, already a stockholder in the company, purchased 50 shares of said stock from Ruth Brown at $100.00 per share; that on October 5, 1929, Franc Morse purchased from Ruth Brown 91 shares of said stock at $100.00 per share.

"That there were other sales of said stock made during said years as a result of deaths of stockholders and disposition of estates, but sales made under said circumstances are not included in the above."

Appellant contends that isolated sales of closely held stock do not establish market value, and maintains that "the law in California upon the valuation of closely held stock is set forth in the *Estate of Felton,* 176 Cal. 663, at page 667 [169 Pac. 292, 293]", in which case the court held that the only way to establish market value of closely held stock is to ascertain the value of the property which they represent, assigning to each share its proportionate worth. It should

be noted, however, that in the Felton case the court said: "Its shares of stock have never been upon the market, and *they have never been sold privately.*" In *In re Dupignac's Estate,* 123 Misc. Rep. 21 [204 N. Y. Supp. 273, 279] (cited by appellant), the court said: "The book value of stock is its intrinsic value. If there have been no sales, the assessor must necessarily fall back upon the book value as the nearest approximation to the fair market value. In the absence of sales, the book value must be taken as the basis of computation. Any other rule would be illogical, and create an impotent conclusion. The use of the words 'fair market', or 'clear market' value, when applied to closely held stock, is meaningless. Because there is no market to guide, such stock must be appraised at its value in money—its intrinsic worth." So, too, in the case just cited, it was said: "The stock of the instant corporation is known as closely held stock, *no sales* having been reported for over 10 years last past."

Surrogate Slater, who wrote the opinion in the Dupignac case, later had occasion to write the opinion in *In re Kerr's Estate,* 128 Misc. Rep. 353 [219 N. Y. Supp. 487]. In the latter case, which was cited by respondent, the state tax commissioner had appraised 400 shares of stock at $219.89, and the executors contended the fair market value was $165 per share, based upon sales. There, the report of the appraiser referred to two actual sales of the stock, one made in 1924 at $160 per share, and one made in 1926, after decedent's death, at $145 per share, which sales were made in the course of settling two estates. It was in that case held: "There is not a wide difference in range of value between $165 per share and the appraised value of $219.89, indicating that the actual sale at $165 was possibly the fair market value on a narrow market. Without these sales, and following my opinion in *Matter of Dupignac, supra,* I would necessarily have to find the value of the stock as the actual value. But, even to do that, no testimony has been offered, except as may be found in the report of the appraiser, and that fails to indicate how the appraiser arrived at the value of the good will. Consequently I feel, with proof of actual sales, that I might very well decide this matter by reducing the value of the shares of stock and appraise them at $175

per share. An order may be entered in accordance with this memorandum."

In *Heiner* v. *Crosby*, 24 Fed. (2d) 191, at 193: "The fair market price or value of stock at a particular time is a question of fact, to be determined from all the circumstances. Market price implies the existence of a market, of supply and demand, of sellers and buyers. . . . (At 195): After giving due consideration to the sale and prices bid on the Pittsburgh Stock Exchange, restricted as they were, and taking into consideration the company's property, good will, and strategic position, together with the evidence of those most familiar with the property and most competent to estimate its value, the learned District Judge found as a fact that the fair market value of the plaintiff's stock on the dates in question was $22.50 per share, making the taxable gain by reason of the sale $2 per share."

In the case of *Union Trust Co.* v. *Heiner*, 19 Fed. (2d) 362, where the commissioner of internal revenue valued certain stock owned by decedent at $140 per share, the court said (p. 364): "Next, as to the value of the Dilworth-Porter stock, there were no sales in the open market of this stock, and it is only a question of determining the intrinsic worth of the stock. Taking all factors into consideration, we consider that the government is altogether too high in placing the value of this stock at $140 per share. The company had come to the crest of its operation; it was on the decline; it was beginning to lose money at the time of the death of the decedent; and we believe that the value admitted by the plaintiff ($110) was not in excess of the value of the stock in question, and was its intrinsic worth at the time of the decedent's death."

Even in *Jackson's Estate*, 125 Misc. Rep. 787 [211 N. Y. Supp. 537], cited by appellant, in which it was held that isolated sales were not conclusive evidence that selling price was market value of the stock, the court reduced the value of $299.21 per share to $250 per share, taking into consideration all the proof of value submitted to the appraiser, including actual sales of the stock, the statements of assets and liabilities, the actual earnings and the earning power of the corporation, and the other evidence submitted to the appraiser.

As authority sustaining his contention, appellant cites *In re Colt's Estate,* 125 Misc. Rep. 373 [211 N. Y. Supp. 541]. In that case it was held that shares of stock in a corporation closely held and sales of which have occurred infrequently are to be appraised at the book value of the stock, and that an isolated sale of stock made more than five months after decedent's death is not sufficient to establish market value. He also cites *In re Davidson's Estate,* (Sur.) 211 N. Y. Supp. 540. In that case a sale of five shares made eight months prior to the death of decedent, and a sale of two shares made fourteen months prior to such death, were held too isolated to be of assistance in establishing market value. Nevertheless, the court did reduce the value set by the tax commissioner from $179.27 per share to $150 per share.

None of the cases cited by appellant are analogous to the facts of the instant case. The agreed statement of facts shows a consistent sale of shares of this stock over a period of ten years, sold privately, it is true, since it was never listed on the market, but to persons who, it may be assumed, knew its true value. The sales over this period aggregated 1657 shares out of a total issue of 10,000 shares. On December 12, 1928, four days prior to decedent's death, five shares were sold at $100 per share, and 105 shares were sold during the preceding month of October (100 at $100 and five at $115), which was less than two months prior to the said death. We are of the opinion that there was no error on the part of the trial court, when it established a market value of $100 per share, taking into consideration not only the value of the property of the corporation, but also this constant stream of sales flowing over a period of years.

The order appealed from is affirmed.

Conrey, P. J., and Houser, J., concurred.