[Civ. No. 4908. Fourth Dist. Apr. 19, 1955.]

Estate of MILO L. ROWELL, SR., Deceased. ROBERT C. KIRKWOOD, as State Controller, etc., Respondent, v. MILO E. ROWELL et al., Appellants.

James W. Hickey, Chief Inheritance Tax Attorney, Raymond G. La Noue, Deputy Inheritance Tax Attorney, and Vincent J. McMahon, Assistant Inheritance Tax Attorney, for Respondent.

Richard Z. Lamberson and Breckinridge Thomas for Appellants.

GRIFFIN, J.—Milo L. Rowell, Sr., died June 15, 1951. The state inheritance tax appraiser filed his report on May 21, 1953. Therein he appraised 82 shares of stock of the United Warehouse Company, a corporation, at $78,392, or $956 per share, to which report objections were filed by the executors of the Rowell estate, as well as certain representatives of the devisees, legatees, assignees and wards (hereinafter referred to as objectors). One of the questions here presented is whether the court and inheritance tax appraiser incorrectly appraised these shares as to their market value. The other question

involved is whether certain devisees were entitled to be classifid as Class A transferees under section 13307, or as Class D under section 13310 of the Revenue and Taxation Code.

The trial judge (Conley) found generally in favor of the State Controller, with some modification as to the amount of the appraisal of the stock and against the State Controller as to the classification placed upon these particular legatees here involved by the inheritance tax appraiser. On September 1, 1953, he ordered that the inheritance tax appraiser "amend his appraisal and report" accordingly, and to "recompute" the character and value of the interest in the property of said decedent and the inheritance tax thereon, and apply the exemptions according to the findings. On October 13, 1953, the amended report was filed and on October 29, the trial judge (Popovich) signed an order approving the amended report, as ordered, and fixed the inheritance tax accordingly. Objectors appeal from that portion of the order of September 1, overruling their objection to the appraisal of the stock as well as that portion of the order of October 29, fixing the inheritance tax thereon. The Controller appealed only from that portion of the order of October 29 reclassifying these certain devisees as Class A, and fixing the inheritance tax accordingly.

Objectors renewed a motion to dismiss the Controller's appeal on the ground that the order of September 1 was a final order which, in effect, established the basis of the tax. It is contended that more than 60 days elapsed thereafter before he filed his notice of appeal and that the subsequent order fixing the tax was not a final order; that it merely confirmed the mathematical calculations prescribed in the first order. He cited such cases af *Zappettini* v. *Buckles,* 167 Cal. 27 [138 P. 696] ; and *Chambers* v. *Hathaway,* 187 Cal. 104 [200 P. 931]. We see no merit to this contention. Among the appealable orders mentioned in section 1240 of the Probate Code is designated an order "fixing an inheritance tax or determining that none is due." ▇ The order of September 1 is, in effect, an interim order. It did not fix the tax. It amounted to no more than a finding on the issues presented by the contest. It included a direction to the inheritance tax appraiser to amend his appraisal, recompute the character and value of the interest, and apply the exemptions as indicated by the order. Section 14513 of the Revenue and Taxation Code is the statute providing for the action of the court upon the conclusion of the hearing on the objections. It provides

that "Upon the completion of the hearing the court may make such order as to it may seem appropriate." Since it did not attempt to fix the tax therein it was not a final order from which an appeal is permitted. (*Estate of Rath,* 10 Cal.2d 399, 405 [75 P.2d 509, 115 A.L.R. 836]; *Estate of Pala,* 55 Cal.App.2d 647 [131 P.2d 593].)

The next question is somewhat involved and requires a recitation of the factual background. The clear market value of the property in the estate of Rowell was, for taxation purposes, originally appraised at $550,213.08. This included 82 shares of the United Warehouse Company, a so-called "close corporation" with 279 outstanding shares. (*Brooks v. Will-cuts,* 78 F.2d 270, 273) i. e., where the stock is closely held. (See Cal. Admin. Code, title 18 (inheritance tax) § 783 (untraded and closely owned securities).) It was organized in 1908, and deceased was one of the five original organizers. It was stipulated and found by the court that the deceased was not related by blood or marriage to any of the other stockholders; that there had been no sales or offer of sales of stock during the period which would be pertinent to the valuation of the stock; that the corporation's sole business was the rental of warehouse buildings or facilities owned or leased by the corporation and incidental thereto; that it occasionally engaged in the acquisition of real property, the construction of warehouse buildings and the sale of such properties; and that its sole income was from such rentals, plus an occasional capital gain by virtue of a sale of part of its realty. As of June 15, 1951, the corporation leased warehouse properties to certain responsible tenants, which leases were made to expire in 1952 and 1954. These rentals showed a monthly income of approximately $3,400.

The market value of the real property (Parcels A to F inclusive) owned or leased by the corporation, as of June 15, 1951, the date of decedent's death, was found to be $266,900. Parcel E, the Southern Pacific lease (valuation here in dispute), was appraised at $30,000. It was found by the court that the liabilities of the corporation exceeded its assets, other than real estate, by $15,091.20, and that the net market value of its assets was $251,808.80; that its earnings, before taxes, dividends paid, federal taxes paid, and amounts transferred to surplus, for the years 1909 to 1950, both inclusive, were $348,849.52; that from said sum $223,951.50 was paid in dividends, $57,317.02 in federal taxes, and $67,581 was transferred to surplus. The court then found that the market value of the

82 shares was $902 per share, or a total of $73,964. According to the stipulation in evidence, the inheritance tax appraiser originally appraised these shares at $956 per share or $78,392. Objectors claimed that the market value of these shares did not exceed $400 per share and proceeded to produce evidence to establish their claim.

Under section 14512 of the Revenue and Taxation Code, for the purpose of the hearing, the report of the inheritance tax appraiser is presumed to be correct. There was received in evidence a stipulation as to certain facts in relation to Parcel E. It was therein agreed that the Southern Pacific Company owned said real property near its tracks; that it was leased to the United Warehouse Corporation, and that in appraising the "underlying assets" of the corporation, the appraiser placed a valuation of $30,000 upon it and a valuation of $236,900 upon the remaining parcels owned by the corporation. Objectors called the inheritance tax appraiser as their witness to determine what method he followed in appraising the value of the stock in question. He testified he viewed the properties, made a breakdown of all of the improvements, considered the age of the buildings, the cooling system, plumbing, etc., cost of reproduction, and considered property depreciation, the balance sheet showing the earnings of the corporation since 1937, and items of expense; that he reviewed the leases existing thereon as to length, rental income, responsibility of lessees, the length of time the corporation had been in this business, its nature, the likelihood of continued prosperity, competition in the business, its location in the industrial area, the market value of the individual properties, and took "into consideration all of the matters submitted to him which he could develop"; that he determined the present market value of the underlying assets, subtracted the liabilities and "divided the balance by the number of shares issued" but he believed he made a mathematical error because "it didn't come out like it should." so the actual appraised value should be $902 instead of $956 per share.

Thereupon objectors produced stock exchange and investment experts who testified generally that the stock in question was not a listed stock but that of a close corporation; that in determining the fair market value of such stock, consideration is given to many factors, i. e., the history of the corporation as to previous earnings, the present balance sheet, future market as to buyer and seller, dividend history and policy, possible future earnings, whether or not the stock is a minority

interest, the cash setup; that such stock generally has a lower ratio than a listed security; and made a determination of the price earnings ratio, which "in theory is the market price in many cases." It was then concluded by one witness that the fair market value of the stock in question was around $350 per share, and he said this was "ultra big-hearted." Other witnesses stated that in their opinion the fact that the stock involved constituted only a minority interest in the entirety affected its market value; that since the lease of the ground from the Southern Pacific Company was subject to cancellation upon 30 days' notice it lessened its value and this fact should be taken into consideration in evaluating that property; that if so considered it would have no present value even though the lease provides that the lessee may remove the buildings located thereon in case such notice was given; that under no circumstances would the market value of such leasehold interest exceed $5000. Considerable testimony was received as to the record of the income of the corporation, and the depreciation of its properties, etc.

One expert appraiser witness placed the fair market value of this stock at approximately $250 per share. He fully related the factors considered by him, and his reasons for the opinion expressed. Milo E. Rowell, son of deceased, was attorney for the warehouse corporation for many years. He testified as to his qualifications, training, and experience in handling financial affairs of the family in general, and fully qualified himself as a witness in this respect. He testified generally as to the properties of the warehouse corporation and furnished data upon which the experts based their opinion as to the market value of the shares in question. He was also one of the main beneficiaries under the will.

In rebuttal, the inheritance tax appraiser, after relating his years of experience as such, testified that in appraising Parcel E, the warehouse property leased from the Southern Pacific Company, he took into consideration the present reproduction cost of the building and estimated it to be $135,850; that he depreciated it by 80 per cent, leaving a residue of $27,120; that he then considered the income from the property, past and present; that the present income was approximately $875 per month and after deducting $150 per month (rental to Southern Pacific Company) he arrived at the figure of $725 per month, which would produce an annual income of $8,700, before deducting taxes; that he did not consider the 30-day cancellation clause in the lease as a too-

important factor, because the parties had been operating under it for over 40 years and receiving the income related, without any indication that it would be canceled; that he was acquainted with the policy of the Southern Pacific Company in respect to the leasing of such warehouse property and it was not their policy to cancel such leases as long as such warehouses furnished freight for their particular line; that he believed this lease would not be presently terminated but would continue to remain in force as it had in the past, and if it should be terminated the railway company would not want the warehouses removed but would consent to a sale or assignment of the lease to someone who would bring freight transportation to its company; that he fully considered all of these possibilities in appraising this leasehold interest, and he refused to take a pessimistic view of the relationship of the railway company to the leases of this type.

It appears to be objectors' contention that the record conclusively shows that the inheritance tax appraiser, in appraising the market value of the stock, solely, literally and erroneously followed the rule laid down in *Estate of Felton,* 176 Cal. 663 [169 P. 392], wherein it was stated that the Felton Company was a close family corporation; that its shares of stock were never upon the market and never had been sold privately; that "According to the views of respondent the *only* way to establish the market value of such shares of stock is to ascertain the value of the property which they represent, assigning to each share its proportionate worth." The court therein stated: "This is the method of determining market value which has been adopted in New York and approved by the courts." (Citing cases.) And that the court was "in accord with respondent's theory that under the circumstances of this case the method of reaching the value of the shares of stock which was adopted was the proper one." It was then stated that there was no force in the appellant's contention that the stock was of less value since it was a minority interest, because appellant eventually obtained a majority interest in the corporation. It then said that "Appellant owns a majority of the stock, the other shares belonging to his sister. While the particular stock subject to the tax is less than half of the issue, appellant, as its possessor, is not under the disadvantage that sometimes confront holders of minority interests." In that case a list of the properties of the corporation was furnished by one of the appellants to

the appraiser. In addition, he gave him an estimated value of the assets contributed at the time of the organization of the company, and the values placed by him upon those possessions three months after the death of the decedent. Apparently the trial court used those values as the basis of the worth of the assets in fixing the "market value" of the shares of stock, and then divided the aggregate value of the entire assets by the number of shares of stock issued. The reviewing court (in 1917) placed considerable emphasis upon the fact that the two heirs who furnished the valuation list did not take the witness stand to question the value placed upon the shares by the inheritance tax appraiser, and held that outside parties who testified generally as to the value of the property represented by the shares had little idea or only a general knowledge of their value. The Supreme Court concluded that the trial court did not base its findings solely upon the estimate submitted by the heirs, and discussed other evidence tending to support the findings sustaining the report of the inheritance tax appraiser. It concluded that the estimated statement of assets of the heirs had "some evidentiary force as an admission of the value of the property," but aside from this there was expert testimony regarding the market value of the various items of property. Accordingly, the court found that the appraisal was otherwise supported by substanitial evidence. It stated that the market value of stock at the date of the death of a decedent is "the proper basis" for the fixing of the tax; that generally such market value is quite distinct from the ratio between the number of shares assessed and the value of the corporation's property; and that the rule followed in that case for determining market values was that employed in other cases, and said that where there is "a close family corporation," "under the circumstances above mentioned" the method of reaching the value of the shares of stock adopted was the proper one.

■ We are not in accord with the contention of the inheritance tax appraiser that in all so-called "close corporations," where the shares of stock have never been upon the market, "the *only* way to establish the market value of such shares of stock is to ascertain the value of the property which they represent, assigning to each share its proportionate worth." (Italics ours.) While this may have been the only way of making such determination under the circumstances of that case, it is clearly not the *only* way in *all* so-called "close corporations." In the instant case there is no evidence that this

is a "close family corporation." Secondly, it is not indicated that the deceased owned a majority interest in the shares of stock. There are many allowable factors which must be considered in determining not only the value of the assets but also the value of the stock in question. (Cal. Admin. Code, title 18, § 783, *supra*.) █ The basic question for determination in any case is the fair market value of the stock on the date of the transferor's death. (Rev. & Tax. Code, § 13951.) The fair market value is the price which a willing buyer would pay to a willing seller, neither being under compulsion to buy or sell, and both having full knowledge of all pertinent facts. (*Pacific States Sav. & Loan Co.* v. *Hise*, 25 Cal.2d 822, 839 [155 P.2d 809, 158 A.L.R. 955].) Generally, such value is quite distinct from the ratio between the number of shares issued and the book value, or the value of the corporation's property. (*Estate of Felton, supra,* p. 667; *Blackard* v. *Jones*, 62 F.Supp. 234.) However, as in in the Felton case, in determining this fundamental question in closely held corporations there is usually a very limited market for the shares, and often the only practical market is the other stockholders. █ Accordingly, in the absence of other influencing and determining factors, a determination of this value may be properly made by ascertaining the net market value of the property the shares represent, and then assigning to each share its proportionate worth. A similar situation was presented in *Brooks* v. *Willcuts*, 78 F.2d 270, which supports the trial court's conclusion in the instant case. (See also *Estate of Goodhue*, 127 Cal.App. 283 [15 P.2d 771], and cases cited; *Union Trust Co.* v. *Heiner*, 19 F.2d 362; *Schnorbach* v. *Kavanagh*, 102 F.Supp. 828; *Blackard* v. *Jones, supra; Wishon* v. *Anglim*, 42 F.Supp. 359; 23 A.L.R. 2d 775; 117 A.L.R. 143-153, and cases collected.) When objections are made to the inheritance tax appraiser's report, these influencing factors should be considered by the trial court. The only question here presented is whether or not the trial court did take these factors into account in considering the report of the income tax appraiser, and in fixing the tax due.

█ It does appear from the testimony of the inheritance tax appraiser that most of the factors indicated by the objectors were considered by him, and that he used such factors as he believed to be material and pertinent in determining the valuation of the corporation's assets. If the valuation subsequently placed upon this property, considering all these fac-

tors, was proper, it cannot be said that the method adopted by the inheritance tax appraiser was erroneous as a matter of law. Apparently, the trial court considered not only the evidence produced and considered by the inheritance tax appraiser, but also the evidence produced by the objectors. After full consideration, the amount of the appraisement of the inheritance tax appraiser was reduced in some degree and the court fixed its own appraisement of these assets, based upon the factors submitted, and determined that the valuation of the shares of stock was $902 per share. Although the evidence of objectors might well have supported a lesser amount, it cannot be said, as a matter of law, that the trial court erred in its determination since there was sufficient competent evidence to support it. ■ There is no compulsion that a trial court must base its findings on any one expert witness's opinion. (*Estate of Giubbani*, 108 Cal.App. 2d 434 [238 P.2d 1036].)

The finding that Parcel E had a valuation of $30,000 has evidentiary support. ■ It is the rule that every conflicting inference and all conflicting evidence must be construed by this reviewing court on appeal in a manner most favorable to support the findings of the trial court. ■ We must therefore conclude that its findings were based, not on the inheritance tax appraiser's opinion, but on all the facts of the case. (*Estate of Teel*, 25 Cal.2d 520, 526 [154 P.2d 384].)

The appeal of the State Controller presents a much closer question. Decedent, at the time of his death, in addition to other heirs, left surviving him a daughter, Judith L. Willmette. She had two children by legal adoption. The decedent left certain property to them. The inheritance tax appraiser, in his report to the court, taxed said property to them at the rates and exemptions of Class D transferees, that is, as strangers. Objectors filed objections to this report, contending that these adopted children were entitled to the rates and exemptions of Class A transferees. The trial court so found, under subdivisions (c) and (d) of section 13307 of the Revenue and Taxation Code which, at the time of death, read in part as follows:

" 'Class A transferee' means any of the following:

"(a) A transferee who is the husband, . . . lineal ancestor, or lineal issue of the decedent.

"(b) A transferee whose relationship to the decedent is that of a child adopted by the decedent. . . .

"(c) A transferee to whom the decedent for not less than 10 continuous years prior to the transfer stood in the mutually acknowledged relationship of a parent, if the relationship commenced on or before the transferee's fifteenth birthday.

"(d) A transferee who is the lineal issue of a child mentioned in subdivision (b) or (c)."

Effective September 9, 1953, subdivision (e) was added to that section and reads:

"(e) A transferee whose relationship to the decedent is that of a person adopted in conformity with the laws of this State by any lineal issue or child mentioned in this section; . . ."

It is conceded that this amendment covers the question at issue in this case. However, it was not enacted and did not become a law until after the date of decedent's death. It is the claim of the Controller that these adopted children did not come within the provisions of section 13307, *supra,* so as to be classified as Class A transferees, and that subsequent legislation so classifying them was an indication of the intent of the Legislature that, at the time of the death of decedent, it was not so intended, citing such cases as *Caminetti* v. *Pacific Mut. Life Ins. Co.,* 22 Cal.2d 344, 353 [139 P.2d 908]; *People* v. *Santa Fe Fed. Sav. & Loan Assn.,* 28 Cal.2d 675, 685 [171 P.2d 713]; *Estate of Pierce,* 32 Cal.2d 265 [196 P.2d 1]; and *Estate of Mercer,* 205 Cal. 506 [271 P. 1067].

It seems clear, under the decisions, that there is no legal or blood relationship between these adopted children and the parents of the adopting parents. See *In re Darling,* 173 Cal. 221, 226 [159 P. 606], where it is said: "The adoption simply fixes the *status* of the child as to its former and adopted parents. To its grandparents by blood it continues to be a grandchild, and the child of its parents by blood. It does not acquire new grandparents in the persons of the father and mother of an adopting parent." See also *Estate of Jones,* 3 Cal.App.2d 395 [39 P.2d 847]; *Estate of Stewart,* 30 Cal.App.2d 594 [86 P.2d 1071]; and *Estate of Pierce, supra,* p. 269. ■ Accordingly, they are not lineal issue of decedent within the meaning of subdivision (a) of said section. It is only between the adopted children and their adopting parents that such relationship is created. (*Estate of Winchester,* 140 Cal. 468 [74 P. 10]; *In re Darling, supra; Estate of Morris,* 56 Cal.App.2d 715 [133 P.2d 452].)

The only provision which would have included such adopted children, at the time, would be under the interpre-

tation of sections (c) and (d), as applied to the daughter of deceased, Mrs. Willmette, who was a transferee under subdivision (c), to whom the decedent, for not less than ten continuous years prior to the transfer, stood in the mutually acknowledged relationship of a parent, which relationship commenced before the transferee's 15th birthday. Accordingly, it is argued and the trial court found that these adopted grandchildren were the lineal issue of decedent's child mentioned in subdivision (c), and accordingly were entitled to the exemption as a Class A transferee.

Although the argument seems somewhat novel, from the wording used in those subdivisions classifying certain transferees, such a transferee is included and would not be excluded even though decedent's natural daughter would also be classified under subdivision (a). Accordingly, if such adopted grandchildren were originally intended to be so included in Class A transferees, the subsequent clarification of the statute in this respect would not necessarily be an indication that the Legislature did not intend to include them in the first enactment. It is objectors' contention that the amendment appears to be an effort to reframe the original intent of the Legislature and to correct the Controller's strained construction and method of application of the uncertain language of that section as applied to such adopted children, citing *Board of Social Welfare* v. *County of Los Angeles,* 27 Cal.2d 90 [162 P.2d 635].

The Controller claims that under the Inheritance Tax Law (Stats. 1893, chap. CLXVIII) both natural children and adopted children of a decedent were exempted from the Inheritance Tax Law; that in 1903 (Stats. 1903, chap. CCXXVIII) section 1 thereof was amended to include mutually acknowledged children, and the only problem then before the Legislature was to provide tax exemption for certain children, i. e., illegitimate children, stepchildren, and those occupying a position *in loco parentis;* that it did not intend to include therein natural children who might already be included in the first exemption; that to do so would be to presume that the Legislature intended to perform an idle or nugatory act; that the Controller has always construed such adopted children as here mentioned to be strangers to the decedent, citing California Administrative Code, title 18 (inheritance tax) section 631 (Class D transferee); and that accordingly, the construction of a statute by the officials charged with its enforcement over a long period must be given

great weight, citing *Nelson* v. *Dean,* 27 Cal.2d 873, 880 [168 P.2d 16, 168 A.L.R. 467]; and *Estate of Atwell,* 85 Cal.App. 2d 454, 468 [193 P.2d 519].

Although the argument of the Controller has considerable persuasive force, the general policy, presently expressed by the Legislature that legally adopted grandchildren should enjoy the same tax exemption as those of a natural grandchild is not an unreasonable or unjustifiable interpretation of the intent and policy of the Legislature in relation to the first enactment here under consideration. It therefore cannot be said, as a matter of law, that the interpretation placed upon this section, as it previously existed in this respect, is unreasonable and not justifiable.

The motion to dismiss the appeal is denied. Order affirmed.

Barnard, P. J., and Mussell, J., concurred.

A petition for a rehearing was denied May 13, 1955, and appellants' petition for a hearing by the Supreme Court was denied June 16, 1955. Schauer, J., and Spence, J., were of the opinion that the petition should be granted.