[No. E003891. Fourth Dist., Div. Two. Mar. 14, 1988.]

In re the Marriage of GERRY A. and ROBERT A. MICALIZIO.
ROBERT A. MICALIZIO, Appellant, v.
GERRY A. MICALIZIO, Respondent.

**[Opinion certified for partial publication.\*]**

---

\*Parts III-V and VII are not published; they do not meet the standards for publication contained in rule 976(b), California Rules of Court.

COUNSEL

Lurvey & Shapiro, Ira H. Lurvey, Judith Salkow Shapiro and David M. Agnew for Appellant.

Chandler Brown for Respondent.

OPINION

DABNEY, J.—

## FACTS AND PROCEDURAL HISTORY

Robert Micalizio (Robert) has been employed since 1960 for the J. R. Norton Company (Norton), a closely held agricultural corporation. In June 1963, Robert purchased stock in Norton for $100,000 and financed the purchase by executing two promissory notes which called for 19 annual principal payments of $2,500 with balloon payments in the 20th year. Each note stated: "This note is secured by a pledge of shares of stock." Robert, however, retained custody of the share certificates, which were issued in his name alone.

Norton pays dividends only on its preferred stock, all of which is owned by J. R. Norton. The remainder, totalling 25 percent of all stock, is owned by Robert (15 percent) and three other vice-presidents (collectively 10 percent). After a corporate merger, the 150,000 Norton shares were reissued to Robert in January 1971. In March 1971, Robert executed a corporate buy-sell agreement which specified that the minority shareholders could not sell or transfer their stock to any third person without first offering to sell it to the corporation for the lower of the book value of the stock adjusted annually on the basis of standard accounting principles, or the amount offered by any third person.

Robert and Gerry Micalizio (Gerry) were married in June 1971. During their marriage, Robert and Gerry separated and maintained separate households at least four times for periods of six months to three years. Gerry wrote checks from a community account to make the principal payments on Robert's promissory notes. In 1974, the buy-sell agreement was modified to change the formula for determining the price of the stock in the event of a sale to the corporation.

Robert filed a petition for dissolution in May 1981. The judgment as to marital status became final in December 1981, and the court reserved jurisdiction on all other issues. A one-day court trial was held on August 16, 1984. The evidence showed that the value of the stock under the buy-sell agreement was approximately $13 per share. The 1971 buy-sell agreement and the 1974 modification were introduced as exhibits. Roger Stevenson, the secretary-treasurer of Norton, testified that if Norton were to liquidate all of its assets, its stock would be worth $25 per share. Stevenson further testified as to the history, activities, and operations of Norton.

On November 30, 1984, the court filed its "Ruling After Court Trial," which stated that the Norton stock had not been transmuted from Robert's separate property to community property. However, the court ruled that the stock should be valued "on the pro-tanto basis, allocating a portion of the value at the date of trial to the community." The court found that there was no evidence of premarriage appreciation in the value of the stock and found that nine annual principal installments of $2,500 on Robert's promissory notes to the Nortons had been made by the community, for a total contribution of 22.5 percent of the purchase price of the stock, or the equivalent of 33,750 shares. The court assigned a value of $13.667 per share to the stock, but directed division of the community shares in kind. The Ruling After Court Trial was never entered in the judgment book.

In June 1984, the buy-sell agreement was again amended to provide, among other things, that Norton must consent to all stock transfers, assignments, or conveyances. In addition, the amended agreement provided more favorable terms for payment to the shareholder from the corporation for shares redeemed or purchased. Robert did not advise the court or Gerry of the amendment during the trial. After learning of the amendment when she sought to have Norton issue shares in her name, Gerry filed a motion based on Code of Civil Procedure sections 657 and 473 for new trial or to set aside for fraud. Gerry claimed that the newly discovered amendment was oppressive to her and made her shares of Norton stock unsalable. She therefore requested the court to order Robert to pay her the value of the shares of stock.

Gerry filed an "amended" motion for new trial or to set aside for fraud on April 12, 1985, in which she requested the court to order Robert to pay her the value of the shares of stock, and to fix the value at the "fair market price" rather than the contractual buy-out price. Robert submitted declarations of Norton officials stating that: (1) Norton would issue shares of stock to Gerry without the restrictions of the June 1984 agreement, and (2) as of September 30, 1984, the book value of the stock had declined to $12.04 per share because of losses incurred in the lettuce crop.

The court heard the amended motion, and on June 13, 1985, filed its ruling. The court noted that because no judgment had been entered on its earlier ruling, it would treat the amended motion as one to reopen, to reconsider, or for further argument. The court stated that the June 1984 amendment made the stock valueless to Gerry, but did not address Robert's contention that the stock would be issued to Gerry without the restrictions of that amendment. The court reconsidered its earlier valuation of the stock at the buy-back price of $13.67 per share, and concluded that its "real value" was $25 per share. The court entered judgment on April 29, 1986, incorporating its June 13, 1985 ruling. The court ordered Robert to execute a promissory note to Gerry in the amount of $421,875, amortized over 10 years, at 10 percent interest to compensate Gerry for her interest in the stock.

On April 30, 1986, notice of entry of judgment was served on Robert. On May 14, 1986, Robert served notice of intention to move for a new trial. In his declaration in support of the motion, Robert stated that he had not initiated the buy-sell agreements, and that as an employee of and minority shareholder in Norton, he had no power to alter or refuse to enter such agreements. On May 16, 1986, the court filed an order fixing time for the hearing on the motion, erroneously noting on the order that the last date to rule on the motion was July 1, 1986. In fact, under Code of Civil Procedure section 660, the last day to rule on the motion was June 30, 1986.

On June 30, 1986, counsel for both parties met with the trial judge in chambers without a reporter. The court indicated that if Norton and its shareholders, who were not parties to the action, would agree to remove all shareholder restrictions, the court would divide the shares in kind. As a result, Gerry's counsel prepared an amended judgment and Robert's counsel signed the draft approved as to form. Gerry's counsel then delivered the retyped document to the court that afternoon. The court signed the amended judgment on July 1, 1986, one day too late to be timely under section 660. The amended judgment provided that Robert had until July 31 to complete transfer to Gerry of 16,875 shares of the Norton stock, free of *any* shareholder restrictions, except a right of first refusal, or the April judgment requiring Robert to pay Gerry $25 per share would be reinstated.

The parties and Norton could not agree on the language of Norton's right of first refusal. Meanwhile, Gerry's counsel contacted counsel for Norton and threatened to bring a shareholder's derivative action and a suit to compel liquidation once she became a shareholder of record. Norton therefore refused to transfer shares to Gerry. On July 31, 1986, Robert moved for further reconsideration in light of Gerry's alleged deliberate obstruction of

his performance of the amended judgment. The court denied the motion without a hearing.

On August 18, 1986, Robert noticed an appeal from the July 1, 1986, judgment. Gerry moved to dismiss the appeal, contending for the first time that the July 1, 1986, judgment was void and nonappealable because the final day for the court to act on Robert's motion for a new trial was June 30, not July 1. This court suggested that Robert petition the trial court for an order entering the judgment nunc pro tunc as of June 30. The trial court denied Robert's petition, explaining in a minute order dated November 21, 1986, that it signed the amended judgment on July 1, 1986, and ordered it filed on that date in reliance on the clerk's calculation that July 1 was the last day to rule. The trial court further ruled that the July 1 judgment was void. This court therefore dismissed the appeal on December 5, 1986. Robert then petitioned the trial court for the filing of any minute order reflecting the events in chambers which both sides acknowledge took place on June 30, 1986. The court denied that petition, stating that it had no independent recollection of those events.

Robert moved in this court for reconsideration and simultaneously filed a petition for hearing in the Supreme Court. The Supreme Court denied the petition for hearing, and we denied the petition for reconsideration.[1]

On January 5, 1987, Robert filed the current appeal from the trial court's orders denying his applications for nunc pro tunc relief and from the judgment entered on April 29, 1986, "impliedly resurrected and made appealable for the first time upon dismissal of appeal from the subsequent amended judgment as void on December 5, 1986." Gerry again moved for dismissal; we denied her motion.

## I. *The Court Has Jurisdiction to Hear This Appeal*

■ As a threshold question, this court must determine whether it has jurisdiction to hear this appeal. Gerry argues that this court lacks jurisdiction because Robert's notice of appeal dated January 5, 1987, was not timely filed as to the April 29, 1986, judgment, and the timely filing of a notice of appeal is an absolute prerequisite to the exercise of appellate jurisdiction. (*Hollister Convalescent Hosp., Inc.* v. *Rico* (1975) 15 Cal.3d 660, 670 [125 Cal.Rptr. 757, 542 P.2d 1349]; *Estate of Hanley* (1943) 23

---

[1] We noted that because the trial court ruled that the amended judgment was void, Robert's appeal from the void judgment was moot, and Robert's notice of appeal could not be construed to be from the judgment entered April 29, 1986, because it was filed beyond the statutory 60-day period. For reasons set forth below, we now conclude that this comment about the appealability of the April 29, 1986, judgment was erroneous.

Cal.2d 120, 123 [142 P.2d 423, 149 A.L.R. 1250].) Furthermore, neither mistake, accident, misfortune, estoppel, nor waiver will confer appellate jurisdiction. (*Stuart Whitman, Inc.* v. *Cataldo* (1986) 180 Cal.App.3d 1109, 1113 [226 Cal.Rptr. 42].)

In *Avery* v. *Associated Seed Growers, Inc.* (1963) 211 Cal.App.2d 613 [27 Cal.Rptr. 625], the court considered the status of the original judgment after determining that a second judgment was void. The trial court entered judgment for plaintiff Avery against defendants Henderson and Associated Seed Growers; Associated Seed filed a timely motion for new trial. The trial court vacated the judgment and ordered entry of a different judgment in favor of both defendants. Avery appealed from the entry of the second judgment.

Avery contended, among other things, that the relief granted Associated Seed was void because the motion for a new trial was never set or noticed for hearing, heard, or submitted. The appellate court held that the hearing and notice of hearing on a motion for new trial are mandatory unless waived, and if such hearing is not noticed and held, the court has no power to rule on the motion. (*Id.,* at p. 626.) Because the trial court failed to hold a hearing, and for another reason not relevant to this discussion, the appellate court concluded that the second judgment was invalid and a nullity. After reversing that judgment, the court considered the effect of its reversal on the original judgment. The court reasoned: "We think that a reinstatement of the original judgment made effective as of its date of entry on November 23, 1960, either by our express direction or as a result of a general reversal, would not be in the interests of justice. If such judgment is now reinstated as of November 23, 1960, the defendants will be denied their right of appeal therefrom, the time to appeal having long since expired. In the procedural situation now before us, and where there was no order *granting* a new trial and no proceedings taken under section 663 of the Code of Civil Procedure, the defendants did not have the right to take any precautionary cross-appeal from the original judgment. (Cal. Rules of Court, rule 3.) Indeed, as we have already pointed out, the first judgment is nonappealable, and the appeal herein lies only from the second judgment, in respect to which the defendants are not aggrieved parties. [Citation.] It would be in the interests of justice therefore to direct that a reentry of the original judgment be made upon the transmission of the remittitur herein to the court below. While we find no California case in point, we feel that such a direction is consonant with the general principle that where the right of appeal is suspended, an appeal may be taken within the period provided by law, after such right is restored. [Citations.]" (*Avery, supra,* 211 Cal.App.2d at pp. 631-632, fn. omitted, original italics.)

*Avery* addresses the situation where: (a) a first judgment is entered; (b) a motion for new trial is made; (c) the trial court grants the request to modify the first judgment and a new judgment is entered; (d) the second judgment supersedes the first judgment; (e) an appeal is taken from the second judgment; (f) the second judgment is determined to be void; and (g) the time to appeal from the first judgment has expired. The only differences between this case and *Avery* are (1) in *Avery,* the appellate court reversed the void judgment and here the trial court did so on its own motion, and (2) in *Avery* the appellate court specified the time for reentry of the judgment and here the trial court failed to do so on vacating the void judgment. These distinctions are immaterial.

Gerry's counsel agreed with the *Avery* decision but argues that does not apply because unlike in *Avery,* "no fundamental procedural error had occurred suspending [Robert's] right to appeal." When the April 29, 1986, judgment was entered and Robert was given notice, his time to appeal commenced to run. Rather than appealing immediately, however, he chose to pursue relief in the trial court by a motion for new trial. This decision is understandable and commendable; trial court remedies are generally speedier and less costly than an appeal. (See *Lippert* v. *AVCO Community Developers, Inc.* (1976) 60 Cal.App.3d 775, 777 [131 Cal.Rptr. 730].) ■ ■■■ ■ Once the court granted Robert's motion, however, by entering an amended judgment on July 1, 1986, he could not then take an appeal from the April 29, 1986, judgment because the amended judgment vacated the earlier judgment.[2] ■ There can be only one final judgment in an action (*Bank of America* v. *Superior Court* (1942) 20 Cal.2d 697 [128 P.2d 357]; *Channell* v. *Anthony* (1976) 58 Cal.App.3d 290, 302 [129 Cal.Rptr. 704]), and no appeal lies from a vacated judgment. (*Lippert, supra,* 60 Cal.App.3d 775, 778; *Rutledge* v. *Rutledge* (1953) 119 Cal.App.2d 112, 113 [259 P.2d 78].) The modified judgment becomes the appealable judgment and a new period for appeal starts to run from notice of its entry. (*Neff* v. *Ernst* (1957) 48 Cal.2d 628, 634 [311 P.2d 849]; see *Amell* v. *Amell* (1937) 10 Cal.2d 153, 155 [73 P.2d 888].) An appeal from a superseded judgment is a nullity and should be dismissed. (*Pacific Home* v. *County of Los Angeles* (1953) 41 Cal.2d 855, 858 [264 P.2d 544]; *Medak* v. *Cox* (1970) 12 Cal.App.3d 70, 74 [90 Cal.Rptr. 452].) ■ Under these authorities, Gerry's assertion that Robert could appeal from the first judgment despite entry of the amended judgment was clearly wrong.

---

[2] A judgment is appealable, even though void. (*Avery, supra,* 211 Cal.App.2d at p. 630; *Adohr Milk Farms, Inc.* v. *Love* (1967) 255 Cal.App.2d 366, 371 [63 Cal.Rptr. 123].) Rather than dismiss the appeal, the proper procedure is to reverse the void judgment. (*Ibid.*) In this case, however, because the trial court declared that the judgment was void while the first appeal was pending, we dismissed the appeal from that vacated judgment.

In *Lippert, supra,* 60 Cal.App.3d 775, the trial court granted defendants' motions for judgment notwithstanding the verdict and for a new trial. The plaintiffs obtained a reversal on appeal, and the judgment on the verdict was reinstated. Plaintiffs thereafter moved to dismiss defendants' appeal from the judgment on the verdict as untimely. The court held that when a judgment notwithstanding the verdict is reversed on appeal, the reinstated judgment on the verdict is a new judgment for purposes of appeal, and the time for filing a notice of appeal from the reinstated judgment commences to run upon the issuance of remittitur from the appellate court. (*Id.,* at p. 779.) The court followed the principle that a party's right to appeal cannot be cut off by entry of judgment nunc pro tunc. (*Phillips* v. *Phillips* (1953) 41 Cal.2d 869, 875 [264 P.2d 926].) "As defendants had no effective right of appeal until the judgment notwithstanding the verdict in their favor was reversed by this court, nunc pro tunc reinstatement of the judgment on the verdict would result in a complete denial of defendants' right to appeal from that judgment. Due to its remedial character the right of appeal is favored by the courts and applicable rules are construed to preserve the right as far as possible. (*Hollister Convalescent Hosp., Inc.* v. *Rico,* 15 Cal.3d 660, 674 . . . .)" (*Lippert, supra,* 60 Cal.App.3d at p. 779.)

In support of her argument that the principles set forth in *Avery, supra,* and *Lippert, supra,* do not apply, Gerry cites *Winter* v. *Rice* (1986) 176 Cal.App.3d 679 [222 Cal.Rptr. 340] and *Ruiz* v. *Ruiz* (1980) 104 Cal.App.3d 374 [163 Cal.Rptr. 708]. Both of these cases deal with the issues arising from premature appeals, and are not apposite to the facts of this case. Gerry also contends that the case of *Tuck* v. *Tuck* (1966) 245 Cal.App.2d 260 [53 Cal.Rptr. 872] is in point. However, *Tuck* differs fundamentally from this case in that in *Tuck* the time for filing a notice of appeal was never extended under rule 3, California Rules of Court. No *valid* notice of intention to move for a new trial was filed in *Tuck*; the notice was filed too late. (*Id.,* at pp. 262-263.) When the amended judgment arising from the tardy motion was found void, the appellate court restored to efficacy the original judgment, for which no extension of time to appeal had ever been obtained. (*Id.,* at p. 263; see *Reber* v. *Superior Court* (1961) 189 Cal.App.2d 622, 625 [11 Cal.Rptr. 534]; *In re Marriage of Patscheck* (1986) 180 Cal.App.3d 800, 802 [225 Cal.Rptr. 787].)

We conclude that the amended judgment of July 1, 1986, even though void, superseded the first judgment and remained in effect as the operative judgment, suspending the time to appeal from the first judgment, until the amended judgment was declared void in a trial court's minute order of November 21, 1986. When the right of appeal is suspended, an appeal may be taken within the time provided by law after the right is restored. (*Avery, supra,* 211 Cal.App.2d 613, 632; see also *Lippert, supra,* 60 Cal.App.3d 775,

779.) Robert had no right to appeal from the April 29, 1986, judgment while the amended judgment was in place. The reinstated judgment was a new judgment for purposes of appeal, and the time for filing a notice of appeal from that judgment began to run from the date the second judgment was declared void in the trial court. (See *Seeley v. Seymour* (1987) 190 Cal.App.3d 844, 855 [237 Cal.Rptr. 282].) Robert's present appeal is timely.

## II. *The Trial Court Had Jurisdiction to Enter the April 29, 1986, Judgment*

■ Robert contends that the April 29, 1986, judgment was void because it was entered more than 60 days after Gerry's motion for new trial. (Code Civ. Proc., § 660.) In ruling on Gerry's amended motion, the court stated that because no judgment had yet been entered, it would treat the motion as a motion to reconsider, to reopen, or to reargue. The trial court's Ruling After Court Trial filed on November 30, 1984, was not a judgment. Until a judgment is entered in the judgment book, it is not effectual for any purpose, and at any time before it is entered, the court may change its conclusions of law and enter a judgment different from that first announced. (*Phillips, supra,* 41 Cal.2d at p. 874; *Blue Mountain Development Co.* v. *Carville* (1982) 132 Cal.App.3d 1005, 1013 [183 Cal.Rptr. 594].) A judge who has heard the evidence may at any time before entry of judgment amend or change his findings of fact. (*Phillips, supra,* 41 Cal.2d at p. 874; *Travelers Ins. Co.* v. *Superior Court* (1977) 65 Cal.App.3d 751, 759-760 [135 Cal.Rptr. 579].)

Although the court lost jurisdiction to act on the motion for new trial 60 days after the motion was filed, its jurisdiction to enter judgment in the reopened proceedings was not affected. (*Taormino* v. *Denny* (1970) 1 Cal.3d 679, 684 [83 Cal.Rptr. 359, 463 P.2d 711].) The April 29, 1986, judgment was not void.

### III.-V.*

. . . . . . . . . . . . . . . . . . . . .

## VI. *The Trial Court's Valuation of the Stock Was Not Supported by Substantial Evidence*

■ Under Civil Code section 4800, subdivision (a), to divide community property equally, the court must make specific findings concerning the

---

*See footnote, *ante,* page 662.

nature and value of all community assets of the parties unless property is divided in kind. (*In re Marriage of Hewitson* (1983) 142 Cal.App.3d 874, 884 [191 Cal.Rptr. 392].) The trial court's determination of the value of a particular asset is a factual one which will be upheld on appeal if supported by substantial evidence in the record. (*Id.*, at p. 885.)

The court fixed the value of the Norton stock at $25 per share. The court stated that it had considered all of the evidence bearing on the value of the stock, including "the $13.67 figure established under the old agreements, and "the $25.00 figure per Mr. Stevenson."[3] The court also considered other testimony of Mr. Stevenson about the size, volume, and extent of Norton's operations.

■ Robert contends that Mr. Stevenson's testimony was not evidence of the value of Robert's minority stock holdings subject to transfer restrictions. Rather, Mr. Stevenson simply expressed an opinion on a hypothetical situation bearing no relation to the facts, and was not asked to consider liquidation costs, contingent liabilities, or similar factors. ■ When a trial court accepts an expert's ultimate conclusion without critical consideration of his reasoning, and it appears that the conclusion was based upon improper or unwarranted matters, then the judgment must be reversed for lack of substantial evidence. (*Pacific Gas & Electric Co.* v. *Zuckerman* (1987) 189 Cal.App.3d 1113, 1136 [234 Cal.Rptr. 630].) For example, in *Hewitson, supra,* 142 Cal.App.3d at pages 885-887, an expert attempted to determine the value of a closely held corporation by using the selling price/book value ratio of publicly traded companies. The appellate court held that because of differences between the two types of companies, the analogy was improper and the judgment based upon the expert's testimony was not supported by substantial evidence. Similarly, in *In re Marriage of Rives* (1982) 130 Cal.App.3d 138, 149-151 [181 Cal.Rptr. 572], the appellate court reversed valuation of a queen bee business because the trial court accepted the testimony of an expert who relied upon false assumptions and improper factors and failed to consider all of the relevant factors which established value. ■ Here, likewise, Mr. Stevenson's testimony relied on a false assumption and did not include all of the relevant factors which establish the value of minority shares in a closely held corporation.

The basic question for the court was the value of the shares of stock held by the community at the time of trial. In *Hewiston, supra,* 142 Cal.App.3d

---

[3] The only testimony by Mr. Stevenson on the value of the Norton stock came into evidence in response to a hypothetical question at the start of his cross-examination, as follows: "BY MR. BROWN: [¶] Q. What do you think that the real value per share of this company is today? Not its book value, but real value. If you were to liquidate all of the assets in a reasonable amount of time, if you were to take the appreciation in the real estate?

"A. Twenty-five million.

"Q. How much would that be per share?

"A. Approximately $25 a share."

at pages 882-883, the court recognized that the determination of the value of closely held stock is a difficult legal problem, and urged the trial court to use the factors listed in the Internal Revenue Service's Revenue Ruling 59-60, 1959-1 C.B. 237 in such determination, unless there is some statutory or decisional proscription against their use.[4] In *Hewitson*, the court was faced with the valuation of a closely held corporation wholly owned by the parties. Here, in contrast, Robert owned a mere minority interest in a closely held corporation dominated by members of the Norton family.[5] ■ In a closely held corporation, *in the absence of other influencing or determining factors*, one method for determining the value of a share of stock is by ascertaining the net market value of the property which those shares represent and by assigning to each share its proportionate worth. (*Estate of Rowell* (1955) 132 Cal.App.2d 421, 429 [282 P.2d 163].) However, as the court explained in *Hewitson*, it is incumbent on a court faced with a valuation problem to consider *each* factor which might have a bearing on the value of the shares. (*Hewitson, supra*, 142 Cal.App.3d at p. 888.)

■ The court listed the factors which it considered in fixing the value of the stock, but did not consider either that Robert owned only a minority block of shares, or that Robert was restricted both as to the price he could obtain for his shares and as to his ability to sell them. Those restrictive agreements and the size of Robert's holdings were factors which have a bearing on the value of the shares. Section 8 of Revenue Ruling 59-60 directs consideration of agreements restricting the sale or transfer of stock. (See, e.g., *Estate of Seltzer* (Tax Ct. Mem. Dec. 1985-519 (P-H) ¶ 85, 519) [when a shareholder died, her shares were sold to the corporation at the value specified in the shareholders' buy-sell agreement. The trial court held that the value under that agreement was controlling. The court explained that inasmuch as the estate was bound by the agreement, the estate's interest in the stock was by contract limited to the book value of the stock].) Moreover Revenue Ruling 59-60 directs consideration of the size of the

---

[4] Those factors include:

"(a) The nature of the business and the history of the enterprise from its inception.

"(b) The economic outlook in general and the condition and outlook of the specific industry in particular.

"(c) The book value of the stock and the financial condition of the business.

"(d) The earning capacity of the company.

"(e) The dividend-paying capacity.

"(f) Whether or not the enterprise has goodwill or other intangible value.

"(g) Sales of stock and the size of the block of stock to be valued.

"(h) The market price of stocks of corporations engaged in the same or a similar line of business having their stocks actively traded in free and open market, either on an exchange or over-the-counter." (Rev. Rul. 59-60, 1959-1 C.B. 237.)

[5] There was *no* evidence in the record to suggest that the shareholders' buy-sell agreements were collusive or that they had been entered to deprive the shareholders' spouses of community property rights.

block of stock. The comments in Revenue Ruling 59-60 state that a minority interest in an unlisted corporation's stock is more difficult to sell than a similar block of listed stock.

This court has also required consideration of restrictive agreements when valuing stock in a closely held corporation. (*In re Marriage of Rosan* (1972) 24 Cal.App.3d 885 [101 Cal.Rptr. 295].) In *Rosan*, the husband owned 15 percent of the stock in Hudson Jewelers. An agreement between the husband and the majority shareholder provided that the husband's shares could not be sold or transferred to anyone other than the corporation or the other shareholder without prior written consent. The other shareholder could purchase such shares for the lower of their "computed value" or the price offered by a third party. "Computed value" was to be determined by a formula based primarily on the book asset value of the stock. Moreover, if the husband quit or was terminated for cause, the other shareholder could purchase the husband's stock for 70 percent of its "computed value." The trial court fixed the value of the stock for purposes of a community property division at 70 percent of its "computed value."

The wife argued that the trial court erred, first by failing to include goodwill, and second, by not valuing the stock at the entire "computed value." With respect to the first contention, this court stated that there was no evidence that the corporation planned a merger, and in the absence of such plan, the corporation or the other shareholder had the right to purchase the stock for the "computed value" if the husband offered it for sale, regardless of the existence of goodwill. (24 Cal.App.3d at p. 890.)

With respect to the second contention, the court noted that for the husband to realize the full "computed value," he would have to die, become permanently disabled, be discharged from his employment without cause, or be offered at least that amount by a third person. The court stated: "An offer from a third person to purchase a minority interest in a closely held corporation paying no dividends for full 'computed value' would be an unlikely prospect," and the husband's death, disability or discharge without cause was also unlikely. (*Ibid.*)

The court concluded: "Under the circumstances disclosed by the evidence, and particularly in view of the restrictive conditions on the disposition of the stock and its resulting illiquidity, factors substantially affecting its value, the trial court was justified in assessing the value of the stock at 70 percent of its 'computed value.' Although that was its lowest value except in the event of a sale to a third person for less, it was the only value that was relatively certain." (24 Cal.App.3d at p. 891.)

The Supreme Court in *In re Marriage of Fonstein* (1976) 17 Cal.3d 738 [131 Cal.Rptr. 873, 552 P.2d 1169] approved a similar approach in a valuation problem. The husband argued that his interest in a law partnership was valueless because it was contingent on his decision to withdraw and subject to modification by agreement of his partners. The court observed that the asset being divided was the interest in the partnership, not the contractual right to withdraw. However, the court explicitly approved the trial court's valuation based on the value of the right to withdraw from the firm as provided in the partnership agreement, and rejected the wife's argument that the value should be based on a percentage of partnership assets. (*Id.*, at pp. 745-747.)

Gerry's counsel ignores *Fonstein* and *Rosan*, and instead cites *In re Marriage of Fenton* (1982) 134 Cal.App.3d 451 [184 Cal.Rptr. 597] and *In re Marriage of Slater* (1979) 100 Cal.App.3d 241 [160 Cal.Rptr. 686], which involved the issue of evaluating the goodwill of a professional practice, in light of the rule that "[W]here the issue is raised in a marital dissolution action, the trial court must make a specific finding as to the existence and value of the 'goodwill' of a professional business as a going concern whether related to that of a sole practitioner, a professional partnership or a professional corporation." (*In re Marriage of Lopez* (1974) 38 Cal.App.3d 93, 109 [113 Cal.Rptr. 58].) Although the courts in *Fenton* and *Slater* did not rely on the restrictive terms of partnership and stock purchase contracts when making required findings of the value of goodwill in professional practices, those decisions do not provide guidance on the issue of valuing a minority block of stock in a closely held corporation.

We conclude that there was no substantial evidence to support the trial court's determination that the value of the Norton stock was $25 per share, and the judgment must be reversed.

## VII.*

. . . . . . . . . . . . . . . . . . .

### DISPOSITION

The judgment is reversed. The trial court is directed to consider whether the community stock should be divided in kind under the principles set forth in *Connolly, supra,* 23 Cal.3d 590 and *Lotz, supra,* 120 Cal.App.3d 379. If the court determines that an in-kind division is not appropriate, the

---

* See footnote, *ante*, page 662.

court is directed to determine the value of the stock in light of the principles set forth in *Hewitson, supra,* 142 Cal.App.3d 874 and *Rosan, supra,* 24 Cal.App.3d 885.

Campbell, P. J., and McDaniel, J., concurred.

A petition for a rehearing was denied April 12, 1988, and respondent's petition for review by the Supreme Court was denied May 25, 1988.