600 A.2d 891

**Jay S. ROSS**

v.

**Inas M. ROSS.**

**No. 1308, September Term, 1990.**

Court of Special Appeals of Maryland.

Jan. 30, 1992.

Harvey B. Steinberg (Kevin G. Hessler and Harvey B. Steinberg on the brief), Rockville, for appellant.

Barbara J. Gorinson (Thomas W. Kavanagh and Joseph, Greenwald & Laake, P.A. on the brief), Greenbelt, for appellee.

Argued Before WILNER, C.J., GARRITY, J., and JAMES T. SMITH, Jr., Judge, Specially Assigned.

GARRITY, Judge.

This appeal by Jay S. Ross is from an order of the Circuit Court for Montgomery County (McKenna, J.) which granted Inas M. Ross' Motion to Reconsider and resolved issues concerning marital property, the monetary award, expert witness fees, and litigation expenses. The order, in effect, overruled a prior order entered by a retiring judge of the same court. The appellant presents the following issues for our review:

1. Whether the court erred when it signed a Judgment of Absolute Divorce which in effect overruled the prior divorce decree entered in the same case by another judge from the same court;

2. Whether the court erred in classifying a pre-emptive right, or right of first refusal, to purchase stock as marital property;

3. Whether the court erred in valuing the stock of a closely held corporation at fair market value in light of a restrictive shareholders' agreement;

4. Whether the court abused its discretion when it established a payment schedule, with interest, for the monetary award rather than making an award on an "if, as, and when" basis;

5. Whether the court erred when, having concluded that certain marital property had been dissipated, it included that property in computing the monetary award; and

6. Whether the award of attorney fees and expenses should be vacated if the monetary award is vacated.

### Facts

Jay and Inas Ross were married on July 23, 1963. Their union yielded three children, one of whom was a minor at the time of the lower court proceedings. During the course of the marriage, Mrs. Ross bore the responsibility for the housework and child care and held either full or part-time jobs for the greater part of the marriage. At the time of trial, Mrs. Ross was employed by the City of Takoma Park as a clerk, earning $24,000 a year.

Throughout most of the marriage, Mr. Ross worked for Pioneer Technologies Group, Inc., a closely held Maryland corporation that is controlled by a small group of individuals, the Washington Shareholders, and a parent corporation, Prioneer–Standard Electronics, Inc. At the time of the trial, Mr. Ross held the positions of Vice President and General Manager, and earned about $178,600 a year. In addition to his base salary, he received an annual performance bonus, as well as a sum pursuant to an agreement with the company solely for the purchase of shares of stock belonging to former shareholders. During the marriage, he purchased a total of 7,130 shares, 6,594 shares acquired prior to the parties' separation and 536 shares subsequent thereto. At issue, however, will be the classification of certain shareholder rights not exercised during marriage.

## I.

After Mrs. Ross filed a Complaint for Absolute Divorce, the case was referred to a domestic relations master for a hearing on the issues of marital property, attorney's fees, and expert witness fees. Judge Calvin R. Sanders held a hearing on Mr. Ross' exceptions to the report and recommendations of the master during which the exceptions were sustained in part. Judge Sanders retired shortly thereafter and Mrs. Ross' request for the court to reconsider its ruling was referred to Judge James J. McKenna, who granted the motion and entered a decree consistent with the master's recommendations.

Appellant contends that Judge McKenna erred when he signed the six month old proposed master's report without a hearing on the motion and without an explanation of his ruling. Relying on *Driver v. Parke–Davis & Co.*, 29 Md.App. 354, 348 A.2d 38 (1975), and *dicta* in *Insurance Co. v. Thrall*, 181 Md. 19, 27 A.2d 353 (1942), appellant argues that these cases stand for the proposition that the trial judge is in a position of greater responsibility than a judge ruling on pretrial matters and, therefore, is entitled to reject a prior decision made by a pretrial judge, in this case, the master. Appellant then argues that a judge who is considering a post judgment motion is without authority to modify a prior ruling of the trial judge. We disagree. Md.Rule 2–536 provides, in essence, that in the event of a judge's termination of office, any other judge of that court may perform the act or duty of the previous judge. Under Md.Rule 2–535, in the exercise of power incident to all courts of record, the succeeding judge, Judge McKenna, was vested with the authority to revise the judgment pursuant to the timely filed motion.

## II.

Appellant argues that the court erred in classifying his pre-emptive right to purchase Pioneer stock as an option to purchase, and therefore subject to equitable distribution as

marital property. Appellant contends that as a shareholder of Pioneer Standard he is bound by a stock purchase agreement which restricts the right of any shareholder to sell, transfer, or otherwise dispose of shares in Pioneer.

The agreement at hand details the terms by which a shareholder's stock is disposed of in the event of death, retirement, or termination of employment, or in the event that a shareholder wishes to sell his stock. The agreement confers upon the remaining shareholders the right to acquire the shares owned by the deceased, retiring, or terminating shareholder at the book value of such shares determined as of the date of the corporation's fiscal year end for the year immediately preceding the death, retirement, or termination. If two or more shareholders desire to purchase stock offered for sale, the right to purchase is directly proportional to the capital stock the shareholder owns as it bears to the total shares issued and outstanding. If the shareholders fail to purchase any portion or all of the stock, then the corporation is bound, in certain instances, to purchase the stock.[1] The primary difference between purchasing the stock under the various circumstances lies in the amount and manner of payment.

The master determined that Mr. Ross' ownership interest was an option to purchase and constituted marital property. He then ordered that 40 percent of the profit Mr. Ross derived therefrom be awarded to Mrs. Ross on an "if, as and when" basis. After considering Mr. Ross' exceptions to the master's report, Judge Sanders ruled that the possible right to purchase another's shares did not constitute an option and did not have a present value. In his written opinion and order Judge Sanders wrote, "[i]t is speculative as to whether or not any such shares will ever be offered for sale, and if so offered, whether or not its then value will

---

1. The documents provide that, prior to the corporation incurring this obligation, the parties may agree that persons within a class of prospective "permitted shareholders" may acquire part or all of the stock being offered.

exceed the book value." On reconsideration, however, Judge McKenna agreed with the master.

■ Maryland has yet to consider whether a pre-emptive right to purchase stock which is acquired during marriage but not exercised prior to the termination of the marriage is marital property subject to equitable distribution. Preliminary to our determination of whether this pre-emptive right is marital property, we must determine if it is property within the meaning of the Marital Property Act, and, if so, whether it was acquired during the marriage. *Green v. Green*, 64 Md.App. 122, 133, 494 A.2d 721 (1985).

Section 8–201(e) of the Md.Fam.Law Code Ann. (1984) defines marital property as "property, however titled, acquired by 1 or both parties during the marriage." [2] Property has been further defined as

> a term of wide and comprehensive signification embracing "everything which has exchangeable value or goes to make up a man's wealth—every interest or estate which the law regards of sufficient value for judicial recognition."
>
> * * *
>
> In *Bouse v. Hutzler*, 180 Md. 682, 686 [26 A.2d 767] (1942), we said that the word "property," when used without expression or implied qualifications, "may reasonably be construed to involve obligations, rights and other intangibles as well as physical things." "Goodwill," for example, has been characterized as a legally protected valuable property right. (citations omitted).

*Archer v. Archer*, 303 Md. 347, 356, 493 A.2d 1074 (1985).

A pre-emptive right is an exclusive right to have the first opportunity to purchase upon specified terms, but only if the owner chooses to sell. VI American Law of Property

---

**2.** Marital Property does not include property acquired before the marriage; acquired by inheritance or gift from a third party; excluded by valid agreement; or directly traceable to any of these sources. Md.Fam.Law Code Ann. § 8–201(e)(2) (1984).

§ 26.64 (A.J. Casner ed. 1952). A pre-emption differs from a traditional option in that:

> An option creates in the optionee a power to compel the owner of property to sell it at a stipulated price whether or not he be willing to part with ownership. A pre-emption does not give to the pre-emptioner the power to compel an unwilling owner to sell; it merely requires the owner, when and if he decides to sell, to offer the property first to the person entitled to the pre-emption, at the stipulated price. Upon receiving such an offer, the pre-emptioner may elect whether he will buy. If he decides not to buy, then the owner of the property may sell to anyone.

*Id.* at 507. *See also, Dennis Rourke Corp. v. Ferrero Construction,* 64 Md.App. 694, 703, 498 A.2d 689 (1985).

In seeking to uphold the lower court, appellee relies upon *Green, supra,* wherein we noted that restricted stock option plans, like pension plans, are a form of employee compensation, "providing to the employee the right to accept within a prescribed time period and under certain conditions the corporate employer's irrevocable offer to sell its stock at the price quoted. If the employer attempts to withdraw the offer, the employee has a 'chose in action' in contract against the employer."

Unlike a stock option or a pension plan, a pre-emption is a mere possibility or expectancy, contingent upon specified but uncertain triggering events. In the instant case, the pre-emption does not reach the level of a property right because fellow holders cannot compel an unwilling owner to divest, unless upon termination of employment, retirement, or death. The pre-emption is inchoate and the interest to which it relates is speculative and remote, the execution of which may depend upon future proportional rights.

Furthermore, valuing the pre-emption is complicated by a provision in the Washington shareholder's agreement establishing as the pre-emptioner's purchase price the book value of the stock for the fiscal year immediately preceding the

event triggering the pre-emption. In its simplest form, book value is calculated by subtracting liabilities from assets. *Valuation and Distribution of Marital Property,* § 22.08[2] (McCahey ed. 1991).

> [M]ore common than a pure book value assessment is a valuation based on various adjustments to the book value. Asset values may be adjusted to reflect inflation and appreciation in value; accounts receivable may be adjusted if they could only be sold at a substantial discount; and unrecorded obligations may necessitate adjustments to liabilities. Accordingly, the straight book value may be reduced based upon involvement in litigation. Risks to the continued success of the business have also been cited as justifying an adjustment to book value.

*Id.* Because of the inability to compel an owner to sell, and given the speculative nature of the pre-emption that a court must value marital property as of the divorce,[3] *Dobbyn v. Dobbyn,* 57 Md.App. 662, 471 A.2d 1068 (1984), and that the purchase price of stock which may be acquired via a pre-emptive right cannot be established in advance of the purchase, we conclude that the mere pre-emptive right at issue cannot properly be termed marital property. Because the court apparently considered the unexercised pre-emptive rights in fashioning a monetary award, we shall vacate the award and remand that matter for reconsideration.

### III.

We now consider the effect of a restrictive transfer agreement on the value of stock in a closely held corporation. Appellant argues that the court, on reconsideration, erred in valuing the stock at fair market value when the shareholder's agreement established book value as the purchase price to be paid in the event that the corporation and other shareholders exercised their pre-emptive rights.

---

**3.** Although not dispositive to our holding, we note that the lower court did not place a value on the pre-emptive right in issue.

Of the other jurisdictions considering this issue, a majority have concluded that the price established by a buy-out or restrictive transfer agreement does not control the determination of value when the other spouse did not consent or was not otherwise bound by its terms. *Argyle v. Argyle*, 688 P.2d 468 (Utah, 1984); *Arneson v. Arneson*, 120 Wis.2d 236, 355 N.W.2d 16 (1984); *Beavers v. Beavers*, 675 S.W.2d 296 (Tex.App.1984); *Lyon v. Lyon*, 439 N.W.2d 18 (Minn. 1989); *Pelton v. Pelton*, 167 Mich.App. 22, 421 N.W.2d 560 (1988); *Ullom v. Ullom*, 384 Pa.Super. 514, 559 A.2d 555 (1989); *In Re Marriage of Moffatt*, 279 N.W.2d 15 (Iowa 1978); *see also Effect of Restrictive Agreement on Valuation*, 6 Equitable Distribution Journal 49 (1989). Courts have rejected buy-out provisions on the basis that they do not necessarily represent the inherent worth of the stock to the parties. A growing number of jurisdictions, however, have determined that while a restrictive stock transfer agreement is not binding on the court, it is a factor to be considered. *Bosserman v. Bosserman*, 9 Va.App. 1, 384 S.E.2d 104 (1989); *In Re Marriage of Micalizio*, 199 Cal. App.3d 662, 245 Cal.Rptr. 673 (1988); review denied May 25, 1988; *Stearns v. Stearns*, 4 Conn.App. 323, 494 A.2d 595 (1985); *Rogers v. Rogers*, 296 N.W.2d 849 (Minn.1980); *Amodio v. Amodio*, 70 N.Y.2d 5, 516 N.Y.S.2d 923, 509 N.E.2d 936 (1987); *In the Matter of the Marriage of Belt*, 65 Or.App. 606 (1983); *Buckl v. Buckl*, 373 Pa.Super. 521, 542 A.2d 65 (1988); *Suther v. Suther*, 28 Wash.App. 838, 627 P.2d 110, *rev. denied*, 95 Wash.2d 1029 (1981); *see generally* I.R.S.Rev.Rul. 59–60, 1959—1 C.B. 237 (restrictive agreement is factor to consider). A third position has been adopted in some jurisdictions. These states hold that the terms of the restrictive agreement presumptively control value. *See, e.g., Bowen v. Bowen*, 96 N.J. 36, 473 A.2d 73 (1984). Finally, a small minority of jurisdictions have concluded that the price established in a restrictive stock transfer agreement is binding. *Sweeney v. Sweeney*, 534 A.2d 1290 (Me.1987), *appeal after remand*, 556 A.2d 660 (1989); *In Re Marriage of Hogeland*, 448 N.W.2d 678 (Iowa

App.1989); *McCabe v. McCabe,* 374 Pa.Super. 451, 543 A.2d 558 (1988).

■ The court in *Bosserman v. Bosserman,* 9 Va.App. 1, 384 S.E.2d 104 (1989), carefully analyzed the considerations giving rise to stock transfer restrictions and to an equitable distribution of marital property.

A decision to reject the valuation method set by a restrictive transfer agreement or by-law does not mean that they are not binding and enforceable between the business partners. Many legitimate business purposes, such as protecting the business from outside intervention or change in ownership, providing economic continuity, and estate and tax planning, are served by such provisions. Skoloff, *The Value of a Law Practice in a Divorce,* A.B.A.J. 38 (March 1988). The price established for buy-out purposes, however, is often artificial and does not always reflect true value. The very purpose of such provisions or agreements often is to discourage sales by restricting the price which could be realized to less than the actual value to the owner. Further, depending upon the circumstances between the parties and the nature of the restrictions on transfer, whether they merely limit or prohibit marketability to third persons, the true value of the stock may be primarily controlled by factors other than marketability. For instance, restrictions on marketability may have no effect upon other benefits which the shareholder derives from his stock ownership, such as dividends, director's fees, participation in health, life or accident insurance programs, retirement plans and numerous other benefits which increase the value of the stock to its owner irrespective of its value in the marketplace. Accordingly, the sale price set by restrictive provisions on transfer is not conclusive as to the value of the stock.

On the other hand, the limitation created by the restrictive agreement necessarily affects the actual marketability of the stock, and thus its value. Therefore, a bona fide provision or agreement must be considered when a trial

court determines the value of stock for purposes of equitable distribution. When stock is subject to a restrictive transfer agreement or by-law the price fixed by such provisions will not control its value, but the restriction on transfer is a factor which affects the value of the stock for purposes of equitable distribution. We affirm, therefore, the trial court's ruling that it was not bound by the value established in the by-laws for transferring the stock as between the shareholders and the corporation.

The extent to which such restrictive provisions influence value depends upon numerous factors, including the nature, size and purpose of the corporation; the type and nature of its assets; the terms of the restrictions or transfer provisions; the nature and existence of escape clauses; optional provisions for valuation; and any circumstance which could affect the corporation, the stockholders or their relationship. Depending upon the circumstance of each case, different methods of valuation may reflect more accurately the actual value of the stock to the shareholder. In some instances the rate of return on investment might control; in others the fair market value of the corporate assets might be predominant; and in others the value to the shareholder of benefits derived from the corporation could be significant. (citations omitted).

The *Bosserman* analytical framework is persuasive. Accordingly, we hold that, although a restrictive stock transfer agreement is not binding on the court, it is a factor for the court to consider.

■ In the proceedings below, the chancellor was aware of the restrictive transfer agreement. The expert witness who valued the stock testified that in preparation for evaluating Pioneer Technologies he reviewed company financial statements and tax returns, read depositions and the stock purchase agreement, met with the company controller, and toured the facilities. In addition to testifying about the valuation methods used, the expert provided extensive testimony about the interplay between the provisions of the

stock agreement and the value of the company. We conclude, therefore, that the court did not err in establishing a stock value different from the value set out in the restrictive stock agreement.

## IV.

It is well established that both the amount and manner of payment of a monetary award are committed to the discretion of the trial court. *Deering v. Deering*, 292 Md. 115, 437 A.2d 883 (1981); *Ward v. Ward*, 52 Md.App. 336, 449 A.2d 443 (1982). Appellant contends that the trial court abused its discretion in establishing the manner of payment of the $700,000 monetary award. The schedule required Mr. Ross to make payment to Mrs. Ross as follows: $75,000 payable within fifteen days of the court's order, $75,000 payable upon settlement of the sale of the marital home, and the balance of $550,000 payable at a rate of $30,000 per year, with interest, commencing one year and fifteen days from the date of the court order. Appellant argues that the appropriate manner of payment would be to award Mrs. Ross a percentage of the amount that Mr. Ross receives from the Pioneer Technologies stock if, as and when he receives proceeds from the stock. He urges this position because according to his Shareholders' Agreement, if he sells the stock before he retires, he will incur a 25 percent penalty if the corporation or other shareholders exercise the right of refusal and purchase the stock.

Appellant has referred us to two cases which have used the "if, as and when" approach to a monetary award. In *Green v. Green*, 64 Md.App. 122, 494 A.2d 721 (1985), the court recommended an "if, as and when" approach to the valuation and equitable allocation of unexercised stock options. The court suggested this resolution to prevent the lower court from adopting an approach that would operate to compel the holder of the stock options to exercise those options, "since to do so would have the effect of depriving

[the option holder] of the essence of his property interest, i.e., the right to make a choice regarding the exercise of the options." *Id.* at 137, 494 A.2d 721.

Unlike *Green,* appellant has already acquired the stock in issue. His interest in that stock is ripe for valuation and equitable adjustment.

Appellant also refers us to cases allocating pension benefits on an "if, as and when" basis. Courts have adopted an elastic approach to valuing pensions because the difficulties in valuing them are frequently compounded by the fact that unmatured rights may be terminated by death, discharge, or other contingencies and by the dual nature of most pension plans. *Deering v. Deering,* 292 Md. 115, 437 A.2d 883 (1981). The uncertainties and complications attendant to pension plans are not present in the matter at hand. While appellant complains about incurring a loss if he sells his stock, he has alternatives available to him other than selling his stock: his portion of the proceeds of the sale of the home may be applied to the payment he must make; he earns an ample salary that can easily accommodate the payment schedule; or he could secure a loan to make the necessary payments. We discern no abuse of discretion in the manner of payment of the monetary award.

■ With regard to the issue of interest on the $30,000 installments ordered by the lower court, however, we agree with appellant. Appellee's monetary award was not reduced to judgment by the lower court. As noted on our behalf by Judge Bloom in *McClayton v. McClayton,* 68 Md.App. 615, 515 A.2d 231 (1986), post judgment interest on the monetary award of marital property payable in installments cannot accrue as to sums not currently payable.

Section 8–205(b) grants the trial court the authority to determine the method of payment of a monetary award, which clearly includes payment in installments. A trial court, however, is without authority to assess interest on

such installment payments, as interest may only accrue against that part of a monetary award that is reduced to judgment. *Id.* at 624, 515 A.2d 231. As § 8–205(b) of the Family Law Article provides, the court may only reduce to judgment a monetary award to the extent that any part of the award is due and owing. Future installments are not currently due and owing.

Upon remand, the lower court, in determining the method of payment of the monetary award in this case, should delete the payment of interest as to any portion of the monetary award which is not properly reduced to judgment.

## V.

Appellant contends that the court erred in concluding that certain assets were dissipated to avoid inclusion in the marital estate.

In *Sharp v. Sharp*, 58 Md.App. 386, 399, 473 A.2d 499 (1984), we recognized that it is "against the Legislature's stated public policy to permit one spouse to squander marital property and render it impossible to make an equitable award of property." When a court finds that property was dissipated to the point of being a fraud on marital rights, it should consider the dissipated property as extant to be valued with other existing marital property. "Dissipation may be found where one spouse uses marital property for his or her own benefit for a purpose unrelated to the marriage at a time when the marriage is undergoing an irreconcilable breakdown." *Sharp*, 58 Md.App. at 401, 473 A.2d 499. The spouse alleging dissipation has the burden of proving dissipation and the value of such property.

An Illinois intermediate appellate court concluded that no dissipation of marital assets occurred where a spouse had withdrawn money from a credit union account, spent the funds on her own support and adequately documented her

expenditures. *In Re Marriage of Sevon*, 117 Ill.App.3d 313, 73 Ill.Dec. 41, 453 N.E.2d 866 (1983). The same court, however, upheld a finding of dissipation where a spouse had withdrawn funds from a joint credit union account and where that spouse's testimony as to his use of these funds was vague and unsupported by records of the purposed marital expenditures. *In Re the Marriage of Smith*, 114 Ill.App.3d 47, 69 Ill.Dec. 827, 448 N.E.2d 545 (1983). The Missouri intermediate appellate court affirmed a trial court's finding of dissipation where jointly owned stocks were endorsed by the husband and cashed by the wife who did not share the proceeds, and where the wife appropriated bank accounts containing her severance pay and retirement benefits. *In Re the Marriage of Faulkner*, 582 S.W.2d 292 (Mo.App.1979).

In the instant case, the chancellor treated various bank accounts, certificates of deposit, custodial accounts, and investments as extant marital property, valued the property and considered it in making a monetary award. The chancellor found that the parties separated in May 1985 and that the appellant had dissipated certain assets thereafter in an attempt to hide them. The chancellor found that the investment accounts were under appellant's control; that he closed various accounts; and that he had made sizeable withdrawals from others. Appellant testified that the investments were his own money and that he did not know what he did with the money he had received from withdrawals and account closures. With the exception of his testimony regarding an expenditure he had incurred due to his daughter's wedding,[4] appellant's testimony was vague and unsupported as was the testimony in *Smith, supra*. Accordingly, we are unable to conclude that the court was clearly erroneous when it considered the property

---

4. The chancellor concluded that the funds spent on the wedding were not dissipated.

dissipated and valued it with other existing marital property.

## VI.

■ Md.Fam.Law Code Ann. § 12–103(b) (1984) sets out the factors the court must consider regarding an award of attorneys' fees. As a prerequisite to awarding costs and counsel fees, a court must consider the financial status of each party, the needs of each party, and whether there was substantial justification for bringing or defending the proceeding.

As the circuit court's disposition following our remand for reconsideration of the monetary award, due to our holding regarding unexercised pre-emptive rights, may possibly affect the financial status of the parties, we shall vacate the award of attorneys' fees and costs and remand for re-examination in light of any change in the financial status of the parties. *Holston v. Holston,* 58 Md.App. 308, 473 A.2d 459 (1984); *Randolph v. Randolph,* 67 Md.App. 577, 508 A.2d 996 (1986).

JUDGMENT AFFIRMED IN PART AND REVERSED IN PART; CASE REMANDED FOR RECONSIDERATION OF THE AMOUNT AND METHOD OF PAYMENT OF THE MONETARY AWARD AND ATTORNEY FEES AND EXPENSES. COSTS TO BE PAID THREE-FOURTHS BY APPELLANT AND ONE–FOURTH BY APPELLEE.